# EXHIBIT 1

EXCERPT FROM LEXIS-NEXIS:

United States v. Burger, No. CR 99-0439 SI, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 2000 U.S. Dist. LEXIS 22066, June 2, 2000, Decided, June 6, 2000, Filed

**OVERVIEW:** Defendant's motion to dismiss the counts in his indictment for kickbacks was granted because he was not provided fair notice of whether his actions in not disclosing a management fee-splitting agreement were considered improper.

**CORE TERMS:** prime, kickback, anti-kickback, contractor, indictment, inspector, fee-splitting, subcontractor, motion to dismiss, directive ... (also see p. 72 of the attachment - regarding the conviction).

Burger v. Kuimelis, No C-02-2309 VRW , UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA , 325 F. Supp. 2d 1026; 2004 U.S. Dist. LEXIS 13169, June 28, 2004, Decided

**OVERVIEW:** Although insurer's conclusory allegations of RICO injury resulted in dismissal of those claims, he sufficiently stated claims against purchasers of its services for breach of contract and fraud based on an alleged illegal kickback arrangement.

**CORE TERMS:** counterdefendant, cause of action, motion to dismiss, service fees, counterclaimant, implied indemnity, counterclaim, misconduct, causes of action, statute of limitations ...

**LexisNexis™ by Credit Card**

Home | LexisNexis™ by Credit Card | Bookstore | Products & Services | Sign Off

View: Full | Cite | KWIC

Documents Purchased | New Search

Help

View in Printable Form

**Your browser settings may prevent your return to this document. Please print or download this document before selecting another.**

**Document Links:**
Start of Document
DISPOSITION:
CASE SUMMARY
PROCEDURAL POSTURE:
OVERVIEW:
OUTCOME:
CORE TERMS:
LexisNexis(R) Headnotes
COUNSEL:
JUDGES:
OPINION BY:
OPINION:

SHEPARD'S® 

*2000 U.S. Dist. LEXIS 22066, ***

UNITED STATES OF AMERICA, Plaintiff, v. EUGENE BURGER, Defendant.

No. CR 99-0439 SI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2000 U.S. Dist. LEXIS 22066

June 2, 2000, Decided
June 6, 2000, Filed

**DISPOSITION:** [*1] Defendant's motion to dismiss counts 13-45 of indictment GRANTED and defendant's motion for a bill of particulars as moot DENIED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant moved to dismiss a number of the counts of the indictment against him and moved for a bill of particulars.

**OVERVIEW:** Defendant was the owner of a property management company which was the management agent for multi-family housing developments. Defendant did not disclose a management fee-splitting agreement to the Department of Housing and Urban Development. Defendant was indicted for theft from a program receiving federal funds, aiding and abetting, money-laundering, violating the Anti-Kickback Act of 1986, and obstruction of justice. Defendant moved to dismiss the kickback counts. The court found that defendant was not provided fair notice of whether his actions in not disclosing the management fee-splitting agreement were considered improper and thus a kickback under the statute. In order to have amounted to a kickback under the statute, defendant's behavior had to have been improper. Defendant had to have been on notice that the alleged conduct was improper. Because defendant would have been unable to determine that the conduct at issue was improper under the statute, the application of the rule of lenity was required in this case.

**OUTCOME:** Defendant's motion to dismiss the counts of the indictment was granted and the motion for a bill of particulars was denied as moot.

**CORE TERMS:** prime, kickback, anti-kickback, contractor, indictment, inspector, fee-splitting, subcontractor, motion to dismiss, directive, rent, legislative history, lenity, aiding and abetting, management fee, favorable, housing, fee splitting, moot, procurement, notice, purpose of obtaining, managing agent, subcontract, indirectly, negotiated, cooperate, rewarding, subsidies, plain language

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Commercial Bribery > Elements
Public Contracts Law > Voiding the Contract > Bribes, Gratuities & Kickbacks
HN1 ⬇ See 41 U.S.C.S. § 53.

Public Contracts Law > Voiding the Contract > Bribes, Gratuities & Kickbacks
HN2 ⬇ See 41 U.S.C.S. § 52 (2) .

Criminal Law & Procedure > Scienter > Knowledge
Criminal Law & Procedure > Scienter > Willfulness
Public Contracts Law > Voiding the Contract > Bribes, Gratuities & Kickbacks
HN3 ⬇ The Anti-Kickback Act of 1986 defines "prime contract" as a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind. 41 U.S.C.S. § 52 (4) . Although civil penalties are available, 41 U.S.C.S. § 54 makes the knowing and willful performance of conduct prohibited by the act punishable by fine or not more than 10 years imprisonment. 41 U.S.C.S. § 54.

Governments > Legislation > Interpretation
HN4 ⬇ It is a basic tenet of statutory interpretation that a district court must look first to the language in which an act is framed to find its meaning. If the language of the statute is clear, the court need not review other aids of statutory interpretation, including legislative history. Legislative history, no matter how clear, can't override statutory text.

Public Contracts Law > Voiding the Contract > Bribes, Gratuities & Kickbacks
HN5 ⬇ The Anti-Kickback Act of 1986 states that a federal contract must be for the purpose of obtaining supplies, materials, equipment, or services in order for the federal contract to meet the act's definition of prime contract. However, the statute does not include a requirement that the supplies or services be for the government. Contracts providing goods

# EXHIBIT 2

INSURANCE FRAUD

Wasserman also admitted that he illegally attempted to evade paying taxes for calendar year 1995. He took several measures to conceal his income, including funneling the income through various corporate entities under his control and causing these corporations to pay his personal expenses, using nominees to conceal his control over the corporations paying his personal expenses and causing the corporations to provide him with income by making checks payable to cash.

Wasserman was sentenced to two and one-half years on the charge of equity skimming and an additional two and one-half years on the charge of tax evasion, to be completed consecutively. He will also pay restitution in an amount not determined at this time.

Defendant Darlene Starkey, a contractor doing business as *Starkey Enterprises*, pled guilty in federal court to theft of funds from at least four HUD assisted developments in and around **Charleston, WV**. Starkey admitted that, between 1998 and 2002, she conspired with the manager of the developments, who is also a target of this investigation, to prepare false invoices for labor and materials that were never provided. Upon payment for the labor and materials, Starkey returned half the money to the manager. The approximate loss as a result of this scheme is $400,000. Starkey, pursuant to her plea agreement, has agreed to repay $175,000, but this is subject to review and possible adjustment by the court.

Defendant Michael B. Kuimelis, doing business as *MBK Insurance*, pled guilty in federal district court in **San Francisco, CA**, to one felony count of criminal contempt and was fined $20,000 and sentenced to three years probation, six months electronic home detention, and 150 hours of community service. Kuimelis submitted invoices for insurance premiums under *Eugene Burger Management Corporation's* (EBMC) master insurance policy that included a commission and a service fee of 15-18 percent, in addition to the true cost of insurance. The service fee was then split between MBK and EBMC. Kuimelis failed to disclose the true percentage that he retained from the master insurance policy, and tried to cover up his acts by tampering with a government witness. In addition, EBMC's

portion of the service fee was paid to the *Friandes Group, Inc*. Eugene Burger's wife is the president of *Friandes*.

# HUD Community Planning and Development Programs

The Office of Community Planning and Development (CPD) administers programs that provide financial and technical assistance to states and communities for activities such as community development, housing rehabilitation, homeless shelters, and economic job development. Grantees are responsible for planning and funding eligible activities, often through subrecipients. OIG investigations of these programs disclosed cases of embezzlement, bankruptcy, wire fraud, money laundering, false statements, and forgery.

Defendant Martin G. Barnes, the Mayor of **Paterson, NJ**, pled guilty in federal court to falsifying tax returns, embezzling campaign funds, and stealing money from HUD and the City of Paterson by fraudulently seeking reimbursement from the City's HUD sponsored HOME (Rental Rehabilitation) Program.

Defendant Sara Bost of **Irvington, NJ**, was indicted in federal court on five counts of bribery concerning programs receiving federal funds, wire fraud, and tampering with a witness, victim, or informant. Bost allegedly received cash payments from a contractor who paved a community center parking lot. The cash came from HUD Community Development Block Grant funds. The indictment also alleges that Bost received cash from the owners of a HUD insured multifamily development in Irvington.

A federal jury convicted defendants Charles M. Barber, his spouse, Helen J. Barber, and their son, Charles H. Barber, on 27 counts of bankruptcy fraud, wire fraud, money laundering, and concealing assets. In addition, the father and son were found guilty of misusing public funds, and the son was convicted of providing false statements to a federal Agent. *AMG Industries Inc.*, in **Queensbury, NY**, a company owned and operated by the defen-

**Document Links:**
Start of Document
**DISPOSITION:**
**CASE SUMMARY**
**PROCEDURAL POSTURE:**
**OVERVIEW:**
**OUTCOME:**
**CORE TERMS:**
LexisNexis(R) Headnotes
**COUNSEL:**
**JUDGES:**
**OPINION BY:**
**OPINION:**

SHEPARD'S® 

## *2000 U.S. Dist. LEXIS 22066, ***

UNITED STATES OF AMERICA, Plaintiff, v. **EUGENE BURGER**, Defendant.

No. CR 99-0439 SI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2000 U.S. Dist. LEXIS 22066

June 2, 2000, Decided
June 6, 2000, Filed

**DISPOSITION:** [*1] Defendant's motion to dismiss counts 13-45 of indictment GRANTED and defendant's motion for a bill of particulars as moot DENIED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant moved to dismiss a number of the counts of the indictment against him and moved for a bill of particulars.

**OVERVIEW:** Defendant was the owner of a property management company which was the management agent for multi-family housing developments. Defendant did not disclose a management fee-splitting agreement to the Department of Housing and Urban Development. Defendant was indicted for theft from a program receiving federal funds, aiding and abetting, money-laundering, violating the Anti-Kickback Act of 1986, and obstruction of justice. Defendant moved to dismiss the kickback counts. The court found that defendant was not provided fair notice of whether his actions in not disclosing the management fee-splitting agreement were considered improper and thus a kickback under the statute. In order to have amounted to a kickback under the statute, defendant's behavior had to have been improper. Defendant had to have been on notice that the alleged conduct was improper. Because defendant would have been unable to determine that the conduct at issue was improper under the statute, the application of the rule of lenity was required in this case.

**OUTCOME:** Defendant's motion to dismiss the counts of the indictment was granted and the motion for a bill of particulars was denied as moot.

**CORE TERMS:** prime, kickback, anti-kickback, contractor, indictment, inspector, fee-splitting, subcontractor, motion to dismiss, directive, rent, legislative history, lenity, aiding and abetting, management fee, favorable, housing, fee splitting, moot, procurement, notice, purpose of obtaining, managing agent, subcontract, indirectly, negotiated, cooperate, rewarding, subsidies, plain language

#### LexisNexis(R) Headnotes ✦ Hide Headnotes

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Commercial Bribery > Elements
Public Contracts Law > Voiding the Contract > Bribes, Gratuities & Kickbacks

# EXHIBIT 3

*509610*

BUYER'S COPY

*597201*

DECLARATION OF COVENANTS, CONDITIONS
AND RESTRICTIONS OF DILORETO CONSTRUCTION
AND DEVELOPMENT COMPANY FOR LAKESIDE PLAZA
CONDOMINIUMS PHASE I

1.       RECITALS

1.1 Declarant:   DiLoreto Construction and Development
Company, hereinafter referred to as "Declarant" is the owner of
that certain real property located in the City of Reno, County of
Washoe, State of Nevada, bounded and described more particularly
as follows:

> 83 Condominium Units
> Units  150      to  177      ,    250      to  277      ,
>   350    to    377    consisting of one building together
> with all of the common areas, all as shown on that
> certain map entitled "Lakeside Plaza, Phase I, a
> condominium" recorded as Document No. 597196,
> Official Records of Washoe County, Nevada

1.2 Purpose:   It is the purpose of this Declaration to
submit the land described above and the improvements to be con-
structed thereon to the condominium form of ownership and use in
the manner provided by Nevada Revised Statutes Title 10, Chapter
117.  The name by which this condominium is to be identified is
LAKESIDE PLAZA, PHASE I, a condominium, and its address is 1000
Beck Street, Reno, Nevada.

1.3 Declaration:   Declarant hereby declares that all
of the real property described above is held and shall be held,
conveyed, hypothecated, encumbered, leased, rented, used, occu-
pied and improved subject to the following limitations, restric-
tions, covenants and conditions, all of which are declared and
agreed to be in furtherance of a plan for the subdivision, improve-
ment and sale of said real property and are established and
agreed upon for the purpose of enhancing and perfecting the
value, desireability and attractiveness of the real property
and every part thereof. All fo the limitations, covenants,
restrictions and conditions shall run with the real property
and shall be binding on all parties having or acquiring any
right, title or interest in the described real property or any
part thereof, and shall be for the benefit of each owner of
any portion of said real property, or any interest therein,
and shall inure to the benefit of and be binding upon each
successor in interest of the owners thereof.

When recorded, mail to:

HOY & MILLER, CHARTERED
ATTORNEYS AT LAW
RENO AND ELKO, NEVADA

*597201*

5.8 <u>Dedication</u>: The Association shall have the authority and power to dedicate, to sell, or to transfer any interest to all or any part of the common area to any public agency authority or utility to be used for such purposes and subject to such conditions as shall be deemed to be necessary or beneficial to the Association. No such dedication, sale or transfer shall be effective unless an instrument agreeing to such dedication, sale or transfer has been signed by 67% or more of both classes of members of the Association.

6.    ASSESSMENTS

6.1 <u>Annual Assessments</u>: Promptly after the conveyance by Declarant of the first condominium unit to an owner and not less than 30 days prior to the beginning of each calendar year thereafter, the Association shall estimate the net cash require- ments for the balance of the calendar year or the ensuing year, as the case may be, necessary for the Association to operate and to maintain the property (including maintaining reasonable reserves) and to perform all of its duties in accordance with this Dec- laration. Each condominium unit shall be assessed for its pro rata share of the amount so estimated. The pro rata share of each condominium unit shall be in direct proportion to what each condominium unit bears to the total of all unit ownerships in the property. Any condominium unit not yet conveyed to an owner by Declarant shall be included in computing the pro rata share of each owner, with Declarant paying the amount of such assessment until it is conveyed to an owner. After the initial assessment, maximum annual assessments may be increased 25% above the annual assessment for the previous year without a vote of the members of the Association. Any increase in excess of 25% shall require the vote of 51% or more of both classes of members.

6.2 <u>Special Assessments</u>: In addition, if after establish- ing the amount of the annual assessment the Association determines the annual assessment is inadequate or anticipated to be inadequate to pay the costs of operating and maintaining the property, or if the Association determines that extraordinary costs applicable to one or more years should be or have been incurred for the purpose of paying for the costs of rebuilding, remodeling, removing or constructing capital improvements which are the obligation of the Association, the Association may from time to time during a year establish a special assessment to remedy any such inadequacy or to pay the cost of such capital improvement, and each condo- minium unit shall be assessed for its pro rata share of any such special assessment in the manner provided in 6.1. In the event any special assessment, except a special assessment re- quired as a result of the restoration of damage and destruction

597201

HOY & MILLER, CHARTERED
ATTORNEYS AT LAW
RENO AND ELKO, NEVADA

Page eleven

by the Association pursuant to 9.3 and 9.9, when added to the
annual assessment causes the total annual assessment for said
calendar year to be more than 25% higher than the annual assess-
ment for the prior year, the vote or written consent of both
classes of members shall be required for such special assessment;
otherwise the special assessment may be established without a
vote of the members.  The amount of any special assessment
for capital improvements in the prior calendar year shall be
excluded from the total of annual assessments for the prior
calendar year in determining whether a 25% increase in the
annual assessment over the preceding year has occurred pur-
suant to 6.1.

6.3  Special Assessments:  Each condominium unit shall
also be assessed from time to time for all fines and penalties
to which its owner is subject as a result of violation of the
terms of this Declaration or any rules prescribed by the
Association, and for any other liability, indebtedness or
other obligation of the owner to the Association arising under
9.5 under any other provision of this Declaration or otherwise.

6.4  Costs and Interest Assessments:  In addition to
the foregoing assessments, each condominium unit shall also be
assessed from time to time costs (including reasonable attorney
fees) incurred in collecting the foregoing assessments and
interest at the legal rate per year on such assessments from
the date due until paid in full.

6.5  Payment:  The Association shall inform each owner
in writing of all assessments against his condominium unit.  The
annual assessment shall be payable in equal monthly installments
in advance, on the first day of each month of the year to which
such assessment pertains.  Special and individual assessments
shall be payable in full on the first day of the first month
next following the date on which the owner is informed of such
assessment, unless other provision is made therefor.  Each
assessment shall become delinquent 10 days after it is due.
All such assessments shall be paid to the Association or to any
commercial banking institution designated by the Association to
handle the receipt and disbursement of all such funds pursuant
to the direction of the Association.  The Association, upon
request and for a reasonable charge, shall furnish an owner a
certificate executed by an officer setting forth the status of
payment of all assessment against an owner.

6.6  Procedure for Assessment Requiring Vote of Members:
Any assessment requiring the vote of the members of the Associ-
ation shall be done at either the annual or special meeting of
the members pursuant to the Bylaws of the Association.

507801

HOY & MILLER, CHARTERED          Page twelve
ATTORNEYS AT LAW
RENO AND ELKO, NEVADA

# EXHIBIT 4

Assembly Bill No. 396–Assemblymen Horne,
Allen, Parks and Gerhardt

Joint Sponsors: Senators Hardy,
Schneider and Heck

CHAPTER..........

AN ACT relating to common-interest communities; revising
provisions governing restrictions on the use of systems for
obtaining solar or wind energy; requiring a member of an
executive board who stands to profit personally from a matter
before the board to disclose and abstain from voting on the
matter; revising the provisions governing the regulation of
certain streets in common-interest communities; revising
provisions concerning voting rights exercised by delegates or
representatives; prohibiting an association in a common-
interest community from imposing an assessment against the
owners of certain tax-exempt property; providing that a
foreclosure on a unit is subject to an equity or right of
redemption; providing that official publications related to
issues of official interest must provide equal space for
opposing views and opinions; requiring applicants for a
certificate for the management of a common-interest
community to post certain bonds; making various other
changes to the provisions governing common-interest
communities; and providing other matters properly relating
thereto.

**Legislative Counsel's Digest:**
Existing law provides that a covenant, restriction or condition in a deed,
contract or other legal instrument cannot unreasonably restrict the use of a system
for obtaining solar or wind energy. (NRS 111.239, 278.0208) **Sections 1 and 43** of
this bill specify the circumstances under which a specification regarding the color
of such a system is enforceable.
**Section 3** of this bill provides additional ethical requirements for members of
an executive board by requiring a member who stands to gain any personal profit or
compensation from a matter before the executive board to disclose the matter to the
executive board and to abstain from voting on the matter. (NRS 116.31185,
116.31187)
**Section 3.5** of this bill: (1) states that the provisions of chapter 116 of NRS do
not modify the tariffs, rules and standards of a public utility; and (2) provides that
the governing documents of an association must be consistent and not conflict with
the tariffs, rules and standards of a public utility.
Existing law provides that certain common-interest communities are prohibited
from regulating motor vehicles on thoroughfares accepted by the State or local
governments for public use. (NRS 116.350) **Section 4** of this bill prohibits a
common-interest community from restricting the operation of motorcycles. **Section**

– 3 –

Section 14 of this bill requires that a declarant deliver to an association an ancillary audit of the association's money and audited financial statements from the date of the last audit until the date the declarant's control ends. (NRS 116.31038) Section 14 also requires the declarant to pay for the costs of the ancillary audit. (NRS 116.31038)

Sections 14, 23, 33-35 and 37-42 of this bill eliminate the issuance of permits to reserve study specialists and instead provide for their registration. (NRS 116.31038, 116.750, 116A.120, 116A.260 and 116A.420-116A.900)

Section 16 of this bill lengthens the period between which meetings of the executive board must be held from every 90 days to every quarter, but not less than every 100 days. (NRS 116.31083)

Section 21 of this bill revises provisions relating to financial statements for certain associations. (NRS 116.31144)

Section 22 of this bill permits the executive board to impose certain assessments for the purpose of funding a reserve without a vote of the units' owners under certain circumstances. (NRS 116.3115)

Section 23 of this bill establishes the criteria for evaluating the adequacy of the reserves of an association. (NRS 116.31152)

Existing law requires certain signatures before money in the reserve account of an association may be withdrawn. (NRS 116.31153) Section 23.3 of this bill also requires certain signatures before money in the operating account of an association may be withdrawn.

Section 23.7 of this bill changes existing law to provide that the sale of a unit as a result of a foreclosure of a lien is subject to an equity or right of redemption. (NRS 116.31166)

Section 28 of this bill excludes the books, records and other papers of the association which are in the process of being developed and have not yet been placed on an agenda for final approval by the executive board from the material which the board must make available upon the written request of a unit's owner. (NRS 116.31175) Section 28 also provides that if an official publication contains the views or opinions of the association concerning an issue of official interest, the official publication must, upon request, provide equal space and equivalent exposure to opposing views and opinions. In addition, section 28 provides that if an official publication contains any mention of a candidate or ballot question, the official publication must provide equal space in the same issue to the candidate or a representative of an organization which advocates the passage or defeat of the ballot question.

Section 29 of this bill revises existing law by including financing as a prohibited activity for members of the executive board and officers. (NRS 116.31187)

Existing law provides that except as otherwise provided in the declaration, an association may not require a unit's owner to secure or obtain any approval from the association in order to rent or lease his unit. (NRS 116.335) Section 29.5 of this bill provides that unless at the time a unit's owner purchases his unit, the declaration prohibited the unit's owner from renting or leasing his unit or required the unit's owner to secure or obtain any approval from the association in order to rent or lease his unit, the association may not: (1) prohibit the unit's owner from renting or leasing his unit; or (2) require the unit's owner to secure or obtain any approval from the association in order to rent or lease his unit.

Section 30 of this bill provides additional rights to units' owners by mandating notice before an association may interrupt utility service to a unit's owner. (NRS 116.345)

– 37 –

3. The Commission shall adopt regulations prescribing the requirements for the auditing or reviewing of *the* financial statements of an association pursuant to this section. Such regulations must include, without limitation:

(a) The qualifications necessary for a person to audit or review financial statements of an association; [and]

(b) The standards and format to be followed in auditing or reviewing financial statements of an association [.] *; and*

*(c) The requirement that an audit or review of the financial statements of an association be completed within 180 days after the end of the fiscal year.*



Sec. 22. NRS 116.3115 is hereby amended to read as follows:

116.3115  1. Until the association makes an assessment for common expenses, the declarant shall pay all common expenses. After an assessment has been made by the association, assessments must be made at least annually, based on a budget adopted at least annually by the association in accordance with the requirements set forth in NRS 116.31151. Unless the declaration imposes more stringent standards, the budget must include a budget for the daily operation of the association and a budget for the reserves required by paragraph (b) of subsection 2.

2. Except for assessments under subsections 4 to 7, inclusive:

(a) All common expenses, including the reserves, must be assessed against all the units in accordance with the allocations set forth in the declaration pursuant to subsections 1 and 2 of NRS 116.2107.

(b) The association shall establish adequate reserves, funded on a reasonable basis, for the repair, replacement and restoration of the major components of the common elements. The reserves may be used only for those purposes, including, without limitation, repairing, replacing and restoring roofs, roads and sidewalks, and must not be used for daily maintenance. The association may comply with the provisions of this paragraph through a funding plan that is designed to allocate the costs for the repair, replacement and restoration of the major components of the common elements over a period of years if the funding plan is designed in an actuarially sound manner which will ensure that sufficient money is available when the repair, replacement and restoration of the major components of the common elements are necessary. *Notwithstanding any provision of the governing documents to the contrary, to establish adequate reserves pursuant to this paragraph, including, without limitation, to establish or carry out a funding plan, the executive board may, without seeking or*

– 38 –

*obtaining the approval of the units' owners, impose any necessary and reasonable assessments against the units in the common-interest community if such assessments are made pursuant to findings contained in a study of the reserves of the association conducted pursuant to NRS 116.31152 and an annual review of the results of that study pertaining to whether the amount of the reserves available for the next 5 years is sufficient to repair, replace and restore the major components of the common elements designated in the funding plan conducted.*

3. Any past due assessment for common expenses or installment thereof bears interest at the rate established by the association not exceeding 18 percent per year.

4. To the extent required by the declaration:

(a) Any common expense associated with the maintenance, repair, restoration or replacement of a limited common element must be assessed against the units to which that limited common element is assigned, equally, or in any other proportion the declaration provides;

(b) Any common expense or portion thereof benefiting fewer than all of the units must be assessed exclusively against the units benefited; and

(c) The costs of insurance must be assessed in proportion to risk and the costs of utilities must be assessed in proportion to usage.

5. Assessments to pay a judgment against the association may be made only against the units in the common-interest community at the time the judgment was entered, in proportion to their liabilities for common expenses.

6. If any common expense is caused by the misconduct of any unit's owner, the association may assess that expense exclusively against his unit.

7. The association of a common-interest community created before January 1, 1992, is not required to make an assessment against a vacant lot located within the community that is owned by the declarant.

8. If liabilities for common expenses are reallocated, assessments for common expenses and any installment thereof not yet due must be recalculated in accordance with the reallocated liabilities.

9. The association shall provide written notice to each unit's owner of a meeting at which an assessment for a capital improvement is to be considered or action is to be taken on such an assessment at least 21 calendar days before the date of the meeting.

—

# EXHIBIT 5

# reviewjournal.com



PRINT THIS

Powered by Clickability

Jun. 16, 2007
Copyright © Las Vegas Review-Journal

# HOMEOWNERS ASSOCIATIONS: Gibbons vetoes controversial bill

## Governor cites unintended consequences for decision

By SEAN WHALEY
REVIEW-JOURNAL CAPITAL BUREAU

CARSON CITY -- A bill that would have made what one lawmaker said were numerous consumer-friendly changes to how homeowners associations operate was vetoed by Gov. Jim Gibbons on Friday.

"This bill makes a variety of sweeping changes to common-interest communities," Gibbons said in his veto message. "Some aspects of this bill represent good public policy."

But he said other aspects of the bill could have unintended consequences, such as the possibility of increased assessments, and "the possibility of dramatic changes to common areas without an opportunity for homeowners to participate."

Gibbons recommended having full hearings on the bill at the 2009 legislative session, since many parts of the measure were included at the last minute without a chance for the affected parties to comment.

Sen. Mike Schneider, D-Las Vegas, long a champion of the rights of homeowners who live in associations, including many Southern Nevadans, called the veto a loss for homeowners.

"The consumers really lost on this, and I can't believe the governor would fold on this bill," he said. "He told me a week ago this past Wednesday that he would sign it. He went back on his word."

But others opposed Assembly Bill 396 and welcomed Gibbons' veto.

"It's too bad because a lot of people worked very hard to get some good legislation done," said Las Vegas attorney Michael Schulman, who wanted a veto because of several questionable provisions in the bill. "But the bad outweighed the good."

Schulman, who represents hundreds of homeowners associations in Southern Nevada, was particularly concerned about provisions that would have allowed homeowners to install rolling shutters in common areas. In his letter, Schulman said this section of the bill was drafted "at the behest of one or more special interests groups who sell rolling shutters."

"I hope the factions that are at odds can work together, maybe putting together a presentation before the Legislature returns," he said.

Ultimately it was the rolling shutter issue, and the placement of such devices in common areas, that doomed the bill. Several opponents of the bill said allowing residents to place shutters in

common-area windows would be an unconstitutional "taking."

Gibbons' office was flooded with e-mails and phone messages to veto the bill, which opponents said gave residents of associations too much power.

David Stone, president of Nevada Association Services Inc., a collections agency for homeowners associations, said AB396 would have been a disaster for community associations.

"This bill allows unit owners to install shutters and other window coverings on the outside of their units and common areas," he said in a statement issued last week. "This is a lawsuit in the making. Government has no right or authority to allow for the taking of property without, especially by another person, without at minimum, due process. AB396 allows for an unconstitutional taking of property."

Schneider said the takings issue was seized on by Gibbons to veto the bill, even though the legislative counsel's legal opinion said the measure did not involve any takings.

"I think that was just an excuse," he said. "A couple of big developers called and put pressure on him is my guess."

The right to put shutters on windows is both an issue of safety and of energy conservation, Schneider said. There are break-ins that occur in association complexes, and shutters could protect residents, he said.

The Legislature will get a chance to override Gibbons' veto, but not until February 2009; the 2007 session ended June 5 and lawmakers are not expected to reconvene before then.

Schneider said the Assembly will likely override the veto. The Senate, which passed the bill 19-2, could also override, but the Republican majority might choose instead to support the governor, he said.

The right to install the shutters was just one of the consumer-based provisions in the bill, which was a compromise including concerns raised by many different lawmakers, Schneider said.

The bill also would have required two signatures on checks from association bank accounts to protect against theft; bonding of association managers so homeowners would be protected financially against theft; and a prohibition on delegate voting.

Under the delegate voting concept, homeowners association boards cast ballots from people who do not vote in board elections as voting for the current members. Many homeowners do not vote in board elections.

Other provisions would have prohibited an association from assessing a speeding fine against a homeowner for the actions of a pizza delivery driver or a visiting plumber, Schneider said. It would have allowed police and firefighters to park their emergency vehicles at their homes, he said.

It would have prohibited associations from having the right to review rental agreements between a homeowner and renter, and it would have prohibited an association from using dues toward a homeowner's outstanding fine, Schneider said.

Now when monthly dues are paid, any fine is removed from that payment. The homeowner is then determined to be in arrears on dues and foreclosure proceedings are initiated, he said.

The bill would have blocked homeowners associations from assessing "transfer fees" of as much as

1 percent when a member sells a home to another person, Schneider said.

Associations can provide for all of these types of policies now, but most don't, he said.

Some people claim most residents of homeowners associations are pleased with their boards, but Schneider said any one of them can have a bad board at one time or another.

Schneider vowed to try again in 2009, bringing a new bill with even more provisions to protect residents of homeowners associations.

**Find this article at:**
http://www.lvrj.com/news/8031952.html

☐ Check the box to include the list of links referenced in the article.

Copyright © Las Vegas Review-Journal, 1997 - 2007

Go Green! Subscribe to the electronic Edition at www.reviewjournal.com/ee/

# EXHIBIT 6



# Phil Frink & Associates

*Foreclosure & Trust Deed Services*

July 5, 2007

10318
Sheryl A. Moulton
1000Beck St #366
Reno, NV 89509

RE: 10318 Lakeside Plaza/Moulton

Attached you will find a copy of a Claim of Lien which was recorded on July 5, 2007

If this lien is not paid within thirty (30) days from the date of this letter, a Notice of Default and Election to Sell will be recorded in the office of the County Recorder.

| | |
|---|---|
| As stated in said lien the delinquent amount is | $1,856.42 |
| And will increase $143.09 per month plus late charges in the | |
| amount of $10.00 per month | $ 153.09 |
| The costs for filing said lien is | $ 243.24 |
| For a total of | $2,252.75 |
| Which is due in this office by August 6, 2007 | |

If a Notice of Default and election to Sell is recorded the foreclosure costs will increase by approximately $593.24.

We will require a CASHIER'S CHECK or CASH in order to release said lien. WE CANNOT ACCEPT MONEY ORDERS.

If you have any questions, please feel to call.

Yours truly,

Phillip E. Frink,
President

401 Ryland, Suite #202, Reno, NV 89502
philfrinkassoc@sbcglobal.net
office (775) 32-4CLOSE (775-324-2567)   fax (775) 324-9222

COPY - has not been compared with the Original Document - WCR

APN: 019-443-16
No. 10318

WHEN RECORDED RETURN TO:
Phil Frink & Associates, Inc.
401 Ryland Street Ste 202
Reno, NV 89502

# 3551545
07/05/2007 02:25:00 PM
Requested By
PHIL FRINK & ASSOCIATES INC
Washoe County Recorder
Kathryn L. Burke - Recorder
Fee:   $15.00 RPTT: $0.00
Page 1 of 2
CONFORMED COPY

(Space Above for Recorder's Use Only)

## NOTICE OF DELINQUENT ASSESSMENT-CLAIM OF LIEN

Notice is hereby given that Lakeside Plaza Condominium Association hereinafter called Association, formed to provide the maintenance and preservation of the common area of the Association in the County of Washoe, State of Nevada, pursuant to NRS 116.3116 for the services performed which were to be and were actually furnished, used and performed on the said premises, located in the County of Washoe, State of Nevada, more particularly described as follows:

PARCEL 1:

Unit 366-B of Lakeside Plaza, Phase 1, a Condominium , according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, as Tract Map No. 1827.

PARCEL 2:

An undivided 1/191st interest in the Common Areas as shown on the official maps of Lakeside Plaza, Phases I and II, a Condominium, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, under Filing No. 597196, Official Records and under Filing No. 597200, Official Records, Washoe County, Nevada

And that the whole of said real estate upon which the buildings are situate is reasonably necessary for the convenient use and occupancy of said buildings.

That Sheryl A. Moulton, is/are the name(s) of the owner(s) or reputed owners(s) of said property and improvements hereinabove described.

That the prorata assessment and special assessments, if any, which shall constitute a lien against the above described property amount to $143.00 per month, as provided in the COVENANTS, CONDITIONS AND RESTRICTIONS, recorded April 2, 1979, as Document No, 597201 of Official Records of Washoe County, State of Nevada, and any supplements or amendments thereto, and which have been supplied to and agreed to by said owner(s) or reputed owner(s). That the Association has made demand for payment of the total amount due and owing but said sum has not been paid.

That the amount now owing and unpaid totals $1,856.42 as of July 2, 2007 and consists of delinquent assessments in the amount of $286.18, late fees in the amount of $20.00, Attorney fees in the amount of $205.00, Notice and copy charges $68.54, and reserve assessment in the amount of $1,419.79, and increases at the rate of $143.09 per month, plus late charges in the amount of $10.00 per month, plus attorney fees and the fees of the agent of the Managing Body of the Association incurred in connection with the preparation, recording and foreclosure of this lien.

WHEREFORE, the Association, this lien claimant, claims the benefit of laws relating to liens and mechanics upon said property and buildings and other improvements thereon, as above described, upon the land which the same is erected, together with convenient space above the same as may be and for the costs of preparation and recordation of this claim of lien, the whole of said property being reasonably necessary for the proper use and occupancy of said buildings and other improvements situated thereon.

DATED: July 5, 2007

Phil Frink & Associates, Inc. as Agent
For the Managing Body of Lakeside Plaza
Condominium Association

BY: Phillip E. Frink, President

STATE OF NEVADA  )
                 )SS
COUNTY OF WASHOE)

This instrument was acknowledged before me on July 5, 2007 by Phillip E. Frink.

NOTARY PUBLIC

LORA LEE OWENS
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 02-53252-2 - Expires May 3, 2010