EXHIBIT "A"

DOC # 3308105
11/15/2005 03:49P Fee:18.00
BK1
Requested By
STEWART TITLE OF NORTHERN NEVADA
Washoe County Recorder
Kathryn L. Burke - Recorder
Pg 1 of 3 RPTT 535.05

| A.P.N. # | 019-443-16 |
| R.P.T.T. | $535.05 |
| Escrow No. | 509610-08 |

**Recording Requested By:**

Stewart Title of Northern Nevada

**Mail Tax Statements To:**

Same As Below

**When Recorded Mail To:**

Sheryl A. Moulton
1000 Beck Street #366
Reno, NV 89509

## GRANT, BARGAIN, SALE DEED

THIS INDENTURE WITNESSETH: That **James M. Moore and Mary Jane Moore,** grantor **husband and wife** for valuable consideration, the receipt of which is hereby acknowledged, does hereby Grant, Bargain Sell and Convey to

**see exhibit "B" for

SHERYL A. MOULTON, AN UNMARRIED WOMAN

and to the heirs and assigns of such Grantee forever, all that real property situated in the County of Washoe, State of Nevada, bounded and described as follows:

~~// who acquired title as James M. Moore, a married man and Mary~~

See Exhibit "A" attached hereto and by reference made a part hereof for complete legal description.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and any reversions, remainders, rents, issues or profits thereof.

Dated: Oct. 19, 2005

James M. Moore              Mary Jane Moore

State of Nevada           }
                          } ss.
County of Washoe          }

This instrument was acknowledged before me on Oct. 19, 2005
by:    James M. Moore, Mary Jane Moore

Signature: _____
            Notary Public

RANDI S. BENNETT
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 96-5349-2 - Expires September 17, 2008

(One Inch Margin on all sides of Document for Recorder's use Only)    Page 1 of 2



3389185
11/15/2005
2 of 3

## EXHIBIT "A"

The land referred to herein situate in the State of Nevada, County of Washoe, described as follows:

PARCEL 1:

Unit 366-B of LAKESIDE PLAZA, PHASE 1, a Condominium, according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, as Tract Map No. 1827.

PARCEL 2:

An undivided 1/191st interest in the Common Areas as shown on the official maps of LAKESIDE PLAZA, PHASES I AND II, a Condominium, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, under Filing No. 597196, Official Records and under Filing No. 597200, Official Records, Washoe County, Nevada.

APN:  019-443-16



**(One Inch Margin on all sides of Document for Recorder's use Only)**     Page 2 of 2



3388185
11/15/2005
3 of 3

EXHIBIT "B"

JAMES M. MOORE, a married man and MARY JANE MOORE, husband and
wife and JAMES M. MOORE AND MARY JANE MOORE, husband and wife
as joint tenants as their interests may appear of record



**Amber Garrell**

| | |
|---|---|
| **From:** | David Edington [david@kenyonandassociates.com] |
| **Sent:** | Friday, December 07, 2007 10:13 AM |
| **To:** | Amber Garrell |
| **Subject:** | Attorney of Record- Rockchuck Assoc. |

Hi Amber,

I just received verbal confirmation to appoint Gayle as they attorney of record for Rockchuck Association. This is an unincorporated assoc of four homes and a little common area headed by a chairman. I will mail the few governing docs to the office today. They have also requested that Gayle please attend their meeting on January 17 @ 2pm because they have one homeowner who is feeling a little sue crazy and they will need her there. The meeting will be held either at our office or the assoc, but either way it is not farther than a couple miles from your office. Please let me know if Gayle can attend and I will let the chairman know.

Thank you,

*David Edington*
Kenyon and Associates, Inc.

EXHIBIT "B"

# COVENANTS CONDITIONS AND RESTRICTIONS (CC&R'S)

DECLARATION OF COVENANTS, CONDITIONS
AND RESTRICTIONS OF DILORETO CONSTRUCTION
AND DEVELOPMENT COMPANY FOR LAKESIDE PLAZA
CONDOMINIUMS PHASE I

1.          RECITALS

1.1 Declarant:    DiLoreto Construction and Development
Company, hereinafter referred to as "Declarant" is the owner of
that certain real property located in the City of Reno, County of
Washoe, State of Nevada, bounded and described more particularly
as follows:

        83 Condominium Units
        Units 150     to 177     250    to 277
        350    to 377 consisting of one building together
        with all of the common areas, all as shown on that
        certain map entitled "Lakeside Plaza, Phase I, a
        condominium" recorded as Document No. 597196,
        Official Records of Washoe County, Nevada

1.2  Purpose:  It is the purpose of this Declaration to
submit the land described above and the improvements to be con-
structed thereon to the condominium form of ownership and use in
the manner provided by Nevada Revised Statutes Title 10, Chapter
117.   The name by which this condominium is to be identified is
LAKESIDE PLAZA, PHASE I, a condominium, and its address is 1000
Beck Street, Reno, Nevada.

1.3  Declaration:  Declarant hereby declares that all
of the real property described above is held and shall be held,
conveyed, hypothecated, encumbered, leased, rented, used, occu-
pied and improved subject to the following limitations, restric-
tions, covenants and conditions, all of which are declared and
agreed to be in furtherance of a plan for the subdivision, improve-
ment and sale of said real property and are established and
agreed upon for the purpose of enhancing and perfecting the
value, desireability and attractiveness of the real property
and every part thereof.  All fo the limitations, covenants,
restrictions and conditions shall run with the real property
and shall be binding on all parties having or acquiring any
right, title or interest in the described real property or any
part thereof, and shall be for the benefit of each owner of
any portion of said real property, or any interest therein,
and shall inure to the benefit of and be binding upon each
successor in interest of the owners thereof.

When recorded, mail to:

HOY & MILLER, CHARTERED
ATTORNEYS AT LAW

1.4 Dimensional Units: The common elements consist of the entire condominium property, including all parts of the building other than the units, and including, without limitation, the following:

(a) The land on which the buildings are erected;

(b) All foundations, columns, beams and supports;

(c) All exterior walls of the building, all walls and partitions separating units from the corridors, elevator shafts, stairs and other mechanical equipment spaces, and all concrete floors and concrete ceilings;

(d) Roofs, halls, corridors, lobbies, stairs, stairways, elevator shafts, and entrances to and exits from the buildings;

(e) Yards, gardens, recreational or community facilities, mail rooms, parking and driveway areas and storage spaces;

(f) All central and appurtenant installations for services such as power, light, telephone, gas, hot and cold water, heat, refrigeration, air-conditioning, (including all pipes, ducts, wires, cables and conduits used in connection therewith, whether located in common areas or in units);

(g) All elevators, tanks, pumps, motors, fans, compressors, and control equipment in common area

(h) All sewer pipes;

(i) The areas designated "club house" and parking on the map.

(j) All space devoted to the lodging and use of the manager and other persons employed by the Association in connection with the operation of the condominium property; and

(k) All other parts of the project and all apparatus and installations existing in the building or on the property for common use or necessary or convenient to the existence, maintenance, or safety of the condominium.

1.5  Interests in Common Elements: Each unit owner shall own a share in the common area and in any surplus possessed by the Association, and be liable for common expenses as set forth in Exhibit A which is attached hereto and made a part hereof.

2.    DEFINITIONS

2.1  As used in this Declaration the following definitions shall apply, unless the context otherwise requires:

(a)  Articles of Incorporation and Bylaws: Articles of Incorporation or bylaws, or both as the case may be, of the Association, as the same may be amended from time to time.

(b)  Association: Lakeside Plaza Condominium Association, its successors and assigns.

(c)  Common Area:  The entire project excepting all units granted or reserved.

(d)  Condominium:  An estate in real property consisting of an undivided interest in common in portions of a parcel of real property together with a separate interest in space in a residential building on such real property.

(e)  Owner:  Each person shown by a duly acknowledged instrument recorded in the office of the County Recorder of Washoe County, Nevada, to be the owner of a fee interest in a unit.

(f)  Residence Unit:  The portion of a unit ownership as to which an owner is entitled to exclusive occupancy and all its appurtenances.

(g)  Unit:  The elements of a condominium which are not owned in common with the owners of other condominiums in the project.

(h)  Declarant:  DiLoreto Construction and Development Company, or its successors.

(i)  The Property:  The real property described in 1.1 above, and such additions thereto as may hereafter be brought within the jurisdiction of the Association.

(j)  The Project:  The entire parcel of real property divided or to be divided into condominiums, including the structures thereon.

3.    PROPERTY RIGHTS, OCCUPANCY AND USE OF UNITS AND COMMON AREA

3.1  Unit and Occupancy:  Each unit shall be used as a residence and for no other purpose.  No individual residence shall be occupied by any person or persons other than the owner, the owner's immediate family and lessees approved and obtained as provided in Sections 12 and 13.4 hereof.  Notwithstanding the foregoing, declarant shall have the right to use one unit for an office for sales and administrative purposes related to the property so long as the unit is owned by declarant.

The property is designed for occupancy by adults only and because of the lack of open area for playground, the construction of the buildings to three stories and the limited size of the condominiums, they are not suited for occupation by children or large groups of people.  Therefore, no unit may be occupied on a permanent basis by children under the age of 16 years.  In the event that any owner of a unit should have a child after occupying the unit, such owner shall have a period of one year from the date that such child begins to occupy the unit in which to vacate the premises.  The Association may adopt rules governing the occupation by children who are guests.  No studio condominium may be occupied by more than two people; no one bedroom condominium may be occupied by more than three people and no two bedroom condominium may be occupied by more than five people.

3.2  Common Area:  The common area shall be improved and used for the following described uses and no other.

(a)  The construction and maintenance of the buildings in which the residence units are located.

(b)  Providing vehicular, pedestrian and utility service access to the residence units and all other portions of the common area.

(c)  The construction and maintenance of recreational facilities and structures, and in the use thereof by all the residence owners located in the property and the persons referred to in 3.1 along with any tenants or contract purchasers who reside in the unit.

(d)  Providing landscaping for the buildings in which the units are located and the recreational facilities located on portions of the common area.

(e) Providing parking facilities serving the units and providing facilities and structures necessary to maintain the buildings and the common area.

(f) Providing balconies or patios for the exclusive use of each unit to which such a balcony or patio is appurtenant, and providing storage lockers and areas for the exclusive and nonexclusive use of each unit.

(g) Providing heating and air conditioning services to the unit and to common area.

There shall be no obstruction of the common area nor shall anything be altered or constructed in or removed from or stored in the common area without the written consent of the Association.

3.3 Owner's Easements of Enjoyment: Every owner shall have a nonexclusive right and easement of enjoyment in and to the common area which shall be appurtenant to and shall pass with the title to every unit ownership, which right and easement may be delegated by owner to those persons referred to in Article 3.1, subject to the provisions of this Declaration including but not limited to:

(a) The right of the Association to charge reasonable admission and other fees for the use of any recreational facility situated upon the common area.

(b) The right of the Association to suspend the voting right and right to the use of the recreational facilities by an owner and those persons listed in Article 3.1 hereof, for any period during which any assessment against his unit ownership remains unpaid pursuant to 3.9; and for a period not to exceed that provided for in 3.9 for any infraction of this Declaration and the Association's published rules;

(c) The right of the Association to dedicate or transfer all or any part of the common area to any public agency, authority, or utility for such purposes and subject to such conditions as may be agreed to by the members. No such dedication or transfer shall be effective unless an instrument signed by sixty-seven percent (67%) of the voting power of both classes of members agreeing to such dedication or transfer has been recorded.

(d)  The right of the Association to restrict
access to or interference with heating and air con-
ditioning equipment.

1.4  _Signs_:  No signs of any kind shall be displayed to
the public view from any residence unit or the common area.  Not-
withstanding the foregoing, declarant shall have the right to
place and maintain upon the common area and in units not yet
conveyed by declarant signs and displays of reasonable dimen-
sions for the purpose of transferring all the units in the prop-
erty from declarant to owners.

1.5  _Pets and Window Covering_:  No animals, other than
small household pets shall be permitted to be kept in any unit
or in the common area.  As to household pets the Association
shall have the right to adopt reasonable rules permitting pets
outside a unit if the pet is properly restrained so as to be
under the direct physical control of a person at all times and
to require any owner to remove any animal which is a nuisance
or disturbance to any owner of a unit.  The decision of whether
an animal is a disturbance or a nuisance shall be solely in
the discretion of the Association.  Each unit owner must install
window coverings in his unit with a material visible from the
outside which is beige in color acceptable to the Association
or Developer as the case may be, in order to provide a uniform
appearance to the exterior of each building.

1.6  _Nuisances and Antenna_:  No noxious or offensive
activity shall be carried on in any unit or in the common area,
nor shall anything be done in either place which may become an
annoyance or nuisance to the other owners.  No antenna, wires
and aerials of any type or kind shall be installed or located
outside a residence unit.

1.7  _Alterations_:  Nothing shall be done in or to any
unit, or in, on or to the common area which will impair the
structural integrity of the buildings, or which will structurally
change the buildings or which would alter or change the appear-
ance of any other non-structural condition of the buildings,
as originally constructed without the prior approval of the
Association pursuant to 9.6, provided that any owner may paint,
repaint, tile, wax, paper, or otherwise refinish and decorate
the interior surfaces of the walls, ceilings, floors, and doors
comprising his unit without the prior written approval of the
Association.

3.0  Membership:  Every person or entity which is a record owner of a fee or undivided fee interest in any condominium unit shall be a member of the Association.  The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation.  Membership shall be appurtenant to and may not be separated from any unit ownership.

The Association shall have two (2) classes of voting membership:

Class A.  Class A members shall be all owners of condominium units with the exception of Declarant, or it successors, and shall be entitled to a vote weighted in accordance with Exhibit A.  When more than one person or entity is shown of record to be the owner of a condominium unit, all such persons or entities shall be members.  The vote for such condominium unit shall be exercised as the owners thereof among themselves determine, but in no event shall more than one vote be cast with respect to any condominium unit.

Class B.  Class B members shall consist of Declarant or its successors, and shall be entitled to three votes for each condominium unit of which it is the owner in fee.  Class B membership shall cease and terminate when the total votes of Class A members equal or are greater than the total votes of the Class B members.  Upon the termination of Class B membership, the Class B member shall be deemed a Class A member, and all members thereafter shall have equal and identical interests and voting rights for each unit of ownership.

3.9  Rules and Penalties:  The Association shall have the power to adopt reasonable rules for the regulation of the occupancy and use of the units, balconies, decks and patios and the remaining portions of the common area, provided that such rules are approved by 51% or more of the voting power of both classes of membership of the Association.  Written copies of such rules and any schedule of fines and penalties adopted pursuant to this paragraph shall be furnished to owners.  The Association shall have the power to adopt a schedule of reasonable fines and penalties for violations of the terms of this Declaration, and for violations of any rules adopted pursuant to this paragraph, provided that such schedule is approved by 51% or more of the voting power of both classes of membership of the Association.  The penalties prescribed may include suspension of all right and privileges of membership, provided, however, that suspension for failure to pay assessments shall be for a maximum period of 30 days, renewable by the Association for an additional 30-day period or periods until

paid; and provided, further, that suspension for infraction
of rules of violation of this Declaration, other than for
failure to pay assessments, shall be limited to a maximum period
of 30 days per infraction or violation, and shall be imposed
only after a hearing before the Board of Directors. The
Board may extend said period for an additional period or periods
in the case of a continuing infraction or violation, and no
hearing need be held for such extension. The Association
shall assess fines and penalties and shall enforce such
assessments in the manner provided in Paragraphs 6 and 7.

4.    PRESERVATION OF THE PROPERTY

4.1    Waiver of Partition and/or Subdivision: There
shall be no judicial partition and/or subdivision of the common
area and/or any one or more units, nor shall Declarant or any
person acquiring any interest in the property or any part thereof
seek any such judicial partition and/or subdivision thereof;
provided, however, that if any condominium unit shall be owned
by two or more co-tenants as tenants in common or as joint
tenants, nothing contained herein shall be deemed to prevent
a judicial partition as between co-tenants so long as such
judicial partition does not result in any physical partitioning.

4.2    Severability: No owner shall in any way sever his
unit from his interest in the common area.

4.3    Use Restrictions: Each unit shall be used as a
residence and for no other purpose, as defined in 1.1. Not-
withstanding the foregoing Declarant shall have the right to
use one unit for an office so long as the unit is owned by
Declarant. The portion of the common area so designated on
the Condominium Map of the property as to be used as open
space and to be used for recreational purposes shall be contin-
uously maintained pursuant to the terms of this Declaration for
the exclusive use and benefit of the units and occupants thereof.
No building or other substantial improvement which may in any
way conflict with the use of the portion of the common area
for open space and recreational purpose shall be constructed
upon such portion of the common area.

5.    ASSOCIATION

5.1    Powers and Duties: The Association shall perform
each and every duty required of it by this Declaration.

5.2    Enforcement: The Association shall have the right
and the duty to enforce all the provisions of this Declaration,

including the duty to seek to enjoin any breach or threatened breach of any of the provisions hereof, and to pay all costs (including attorneys fees) of any such action or other enforcement procedure.

5.3 Taxes: Each owner to the extent permitted by law shall cause his condominium unit to be separately assessed for ad valorem property taxes, and shall pay all such taxes when due. Except to the extent separately assessed and charged to the owner or the condominium unit of the owners, the Association shall have the authority and duty to pay all taxes and assessments, if any, levied against the common area or the property generally. Any amounts so paid shall be part of the assessment made against each owner pursuant to Paragraph 6.

5.4 Individual Utilities: Utilities such as electricity and telephone, shall be separately metered and charged to the owners on the basis of the services used by each owner for his unit, which shall include any residence units owned by Declarant. But the Association shall have the authority and duty to pay for the utilities and utility services required for the common area, and shall have the authority to pay for the utilities and utility services for units which are not separately metered or charged to all the owners, provided, however, that the Association shall be reimbursed by the owners thereof for any charge paid by the Association for utilities and utility services rendered to a residence unit and the common area. Such charges will be made by the Association to the unit owners based on their percentage interest in the common area.

5.5 Common Utilities: The heating to the individual units and the utilities to the common area shall be billed to the Association. The Association shall allocate the total cost of heating and utilities supplied throughout the property among the various units based upon the percentage interest in the common area. The percentage interest in the common area is based upon the area of each type of condominium and it is presumed that the area of a condominium unit is the most reasonable relationship to the amount of heating and utilities used by such unit.

The assessment for utilities shall become a lien upon each unit pursuant to the terms of Paragraphs 6 and 7 hereof.

5.6  Extension of Jurisdiction:  The Association shall have the power and authority to accept jurisdiction over other property contiguous to the boundaries of the property provided such property is subject to a Declaration of Covenants, Conditions and Restrictions similar to the terms herein that the annual assessments of the Association against each condominium unit in the Association immediately prior to the acceptance of jurisdiction are not unreasonably increased as a result thereof, and that the assent is obtained of 67% or more of the voting power of both classes of members of the Association. The Association shall have the authority and power to enter into contracts with owners of lands adjoining or near the property and with associations, incorporated or otherwise, having powers with reference to said land similar to the powers held by the Association.  Any contracts so entered into may provide, among other things, for the joint installation, maintenance, repair and removal of facilities benefitting subject property and other lands for the joint retainer of and use of maintenance, professional and management services for the joint discharge of any of the duties of each party to such contract to the extent that the duties so defined shall not be inconsistent with the duties, powers and rights of the Association as herein defined.  Without limiting the generality of the foregoing listed contractual purposes, the Association may also contract with other owners of lands or associations created by owners of lands toward the end that enforcement of the liens established by Paragraph 7 shall be exercised by such other owners or associations in the event that the Association should default in its duties of enforcement as provided in this paragraph.  The right conferred upon the Association to contract with land owners of adjacent lands shall include the right to merge and enter into such management bodies or associations, provided that the assent is obtained of 67% or more of the voting power of both classes of members of the Association.

5.7  Improvements:  The Association shall have the authority and power to construct, improve, repair, demolish, remove and reconstruct any part of the common area not inconsistent with this Declaration, and appropriate for the use and benefit of the members of the Association, and to charge for the use thereof, provided that the Association shall not include in any assessment, annual or special, the cost of any new capital improvement which exceeds $1,000.00 in cost to be expended in any one calendar year, unless a majority of the board of directors shall have approved said expenditure.

5.8  Dedication:  The Association shall have the authority and power to dedicate, to sell, or to transfer any interest to all or any part of the common area to any public agency authority or utility to be used for such purposes and subject to such conditions as shall be deemed to be necessary or beneficial to the Association.  No such dedication, sale or transfer shall be effective unless an instrument agreeing to such dedication, sale or transfer has been signed by 67% or more of both classes of members of the Association.

6.    ASSESSMENTS

6.1  Annual Assessments:  Promptly after the conveyance by Declarant of the first condominium unit to an owner and not less than 30 days prior to the beginning of each calendar year thereafter, the Association shall estimate the net cash requirements for the balance of the calendar year or the ensuing year, as the case may be, necessary for the Association to operate and to maintain the property (including maintaining reasonable reserves) and to perform all of its duties in accordance with this Declaration.  Each condominium unit shall be assessed for its pro rata share of the amount so estimated.  The pro rata share of each condominium unit shall be in direct proportion to what each condominium unit bears to the total of all unit ownerships in the property.  Any condominium unit not yet conveyed to an owner by Declarant shall be included in computing the pro rata share of each owner, with Declarant paying the amount of such assessment until it is conveyed to an owner.  After the initial assessment, maximum annual assessments may be increased 25% above the annual assessment for the previous year without a vote of the members of the Association.  Any increase in excess of 25% shall require the vote of 51% or more of both classes of members.

6.2  Special Assessments:  In addition, if after establishing the amount of the annual assessment the Association determines the annual assessment is inadequate or anticipated to be inadequate to pay the costs of operating and maintaining the property, or if the Association determines that extraordinary costs applicable to one or more years should be or have been incurred for the purpose of paying for the costs of rebuilding, remodeling, removing or constructing capital improvements which are the obligation of the Association, the Association may from time to time during a year establish a special assessment to remedy any such inadequacy or to pay the cost of such capital improvement, and each condominium unit shall be assessed for its pro rata share of any such special assessment in the manner provided in 6.1.  In the event any special assessment, except a special assessment required as a result of the restoration of damage and destruction

annual assessment _ _ _ es the total annual as _ _ ent for said
calendar year to _ _ _ ore than 25% higher tha _ _ _ annual assess-
ment for the prior year, the vote or written consent of both
classes of members shall be required for such special assessment;
otherwise the special assessment may be established without a
vote of the members.  The amount of any special assessment
for capital improvements in the prior calendar year shall be
excluded from the total of annual assessments for the prior
calendar year in determining whether a 25% increase in the
annual assessment over the preceding year has occurred pur-
suant to 6.1.

6.1  Special Assessments:  Each condominium unit shall
also be assessed from time to time for all fines and penalties
to which its owner is subject as a result of violation of the
terms of this Declaration or any rules prescribed by the
Association, and for any other liability, indebtedness or
other obligation of the owner to the Association arising under
9.5 under any other provision of this Declaration or otherwise.

6.4  Costs and Interest Assessments:  In addition to
the foregoing assessments, each condominium unit shall also be
assessed from time to time costs (including reasonable attorney
fees) incurred in collecting the foregoing assessments and
interest at the legal rate per year on such assessments from
the date due until paid in full.

6.5  Payment:  The Association shall inform each owner
in writing of all assessments against his condominium unit.  The
annual assessment shall be payable in equal monthly installments
in advance, on the first day of each month of the year to which
such assessment pertains.  Special and individual assessments
shall be payable in full on the first day of the first month
next following the date on which the owner is informed of such
assessment, unless other provision is made therefor.  Each
assessment shall become delinquent 10 days after it is due.
All such assessments shall be paid to the Association or to any
commercial banking institution designated by the Association to
handle the receipt and disbursement of all such funds pursuant
to the direction of the Association.  The Association, upon
request and for a reasonable charge, shall furnish an owner a
certificate executed by an officer setting forth the status of
payment of all assessment against an owner.

6.6  Procedure for Assessment Requiring Vote of Members:
Any assessment requiring the vote of the members of the Associ-
ation shall be done at either the annual or special meeting of
the members pursuant to the Bylaws of the Association.

6.7  Transfer:  Any assessment upon any condominium unit in addition to any lien rights provided in Paragraph 7 shall be a personal debt of the owner thereof at the time the assessment is made.  The interest of any owner in the amounts paid pursuant to any assessment upon the transfer of the condominium unit shall pass to the new owner.  Upon the termination of these covenants for any reason, any amounts remaining from the collection of such assessments after paying all amounts properly charged against such assessments shall be distributed to the then unit member owners on the same pro rata basis on which the assessments were collected.

7.      LIENS

7.1  General:  The amount of any assessment plus any other charges thereon, such as interest, costs and penalties, and the amount of any delinquent payment or fine as may be provided for in this Declaration, shall be and become a lien upon the condominium unit assessed when the Association causes to be recorded with the County Recorder of Washoe County, Nevada, a notice of assessment, which shall state the amount of such assessment and such other charges as may be authorized by this Declaration, a description of the condominium unit against which the same have been assessed, and the name of the record owner thereof.  Such notice shall be signed by an authorized representative of the Association.  Upon payment of said assessment and charges in connection with which such notice has been so recorded, or other satisfaction thereof, the Association shall cause to be recorded a further notice stating the satisfaction and release of the lien thereof.

7.2  Priority:  Such lien shall be prior to all other liens recorded subsequent to the recordation of said notice of assessment, except that such liens shall be subordinate to any valid bona fide first mortgage or first trust deed which has been or may hereafter be given in good faith and for value on any condominium unit covered by this Declaration.  Unless sooner satisfied and released or the enforcement thereof initiated as hereinafter provided, said lien shall expire and be of no further force and effect one year from the date of recordation of said notice of assessment; provided, however, that said one-year period may be extended by the Association for not to exceed one additional year by recording a written extension thereof.

7.3 Enforcement: Such lien may be enforced by sale by the Association, its attorney or other person authorized to make the sale, after failure of the owner to pay such an assessment in accordance with its terms, such sale to be conducted in accordance with the provisions of Sections 117.070 and 117.075 of the Nevada Revised Statutes, or in any other manner permitted by law. The Association shall have power to bid in the condominium unit at foreclosure sale and to hold, lease, mortgage and convey the same.

8.    INSURANCE

8.1 General: The Association shall have the duty to purchase, carry and at all times maintain in force, insurance covering the common area and all personal property and equipment located thereon for the interest of the Association and of all owners and their mortgagees, as their interests may appear, in such amounts and with such endorsements and coverage as shall be considered good sound insurance coverage for properties similar in construction, location and use to the property. The Association shall purchase thereof in addition to any annual assessment, the following described insurance covering the owner and the condominium unit and personal property located in the residence unit; provided, however, that the Association shall not be obligated to insure any condominium unit of any owner unless the Association is compensated therefor by such owner, and provided further, that the Association shall not be obligated to insure any personal property such as household furnishings of any of the owners unless the Association decides to do so for all the owners on an equal basis. Such insurance shall include, but need not be limited to:

(a) Insurance against loss or damage by fire, hazards covered by a standard extended coverage endorsement, and vandalism, with a clause providing for a waiver of subrogation rights of the insurer provided it does not substantially increase the cost of the policy, with the insurance to be in a amount which shall be equal to the maximum insurable replacement value, excluding foundation and excavation costs, as determined annually by the insurance carrier. The insurance shall include coverage for loss of floors, ceilings, walls, cabinets and attachments to each of such items including carpets, flooring and electrical fixtures.

(b) Bodily injury liability and property damage insurance on a broad form basis.

(c) A fidelity bond or bonds for all officers and employees of the Association having control over the receipt of disbursement of funds in such penal sums as shall be determined by the Association in accordance with its Bylaws.

(d) Workmen's compensation insurance to the extent necessary to comply with any applicable laws.

8.2 <u>Other Insurance</u>: The following provisions apply to other insurance obtained by individual owners on their residence units, if they have authorized the Association to obtain insurance policies on their behalf.

(a) The Association shall furnish to each owner a certificate of insurance, or other evidence of insurance coverage under the Association's master policy and policies issued to the owner. No owner shall obtain any other insurance duplicating in any respect the coverage the Association has obtained, without the prior approval of the Association. This provision is for the mutual benefit of the Association and all owners, in order that reduction of insurance proceeds due to "other insurance" and "proration" clauses shall not occur.

(b) The prohibition against other insurance shall not apply to insurance on personal property or to any insurance obtained by any owner on any risk or on any property which is not covered by policies obtained by the Association.

8.3 <u>Application of Proceeds</u>: The payment and application of the insurance proceeds, if any, from any policy obtained by the Association for itself or on behalf of any owner pursuant to 8.1 hereof, or from any loss payable endorsement, shall be as follows:

(a) In any case where the proceeds are less than $500, the proceeds shall be paid to the Association to be used by it for repair or reconstruction of the damage or destruction to which proceeds relate.

(b)  In all other cases, the proceeds shall be paid to trust account(hereinafter referred to as the "insurance trustee") designated by the Association according to its bylaws to be held in trust for the benefit of the owners, their mortgagee and the Association, as their interests may appear. The Association is authorized on behalf of the owners to enter into such agreement with the insurance trustee relating to the powers and duties of said trustee as the Association may approve.  Said trustee must apply any proceeds to the repair or reconstruction of the damage or destruction to which the proceeds relate.

(c)  In any case in which proceeds of insurance exceed the cost of repair or reconstruction on account of damage or destruction to which such proceeds relate, after completion of the repair or reconstruction, the excess shall be turned over to or retained by the Association and shall be used by the Association to operate and maintain the common area in accordance with it duties.

(d)  In any case in which proceeds of insurance are less than the cost of repair or reconstruction on account of damage or destruction to which such proceeds relate, the balance of the cost of repair or reconstruction shall be paid in the manner provided for in Paragraph 9 hereof.

(e)  In the event the Association after a vote of the members pursuant to 9.9 decides not to rebuild the damaged or destroyed improvements any insurance proceeds remaining after paying any amounts owing to mortgagees shall be distributed to the owners whose residence units are untentable as a result of the damage or destruction that is not being rebuilt in proportion to their undivided interest in the common area.

8.4  Pre-emption of Proceeds by Lender:  In any case where insurance proceeds are pre-empted by any owner's lender for application to said owner's debt, the Association shall immediately impose an individual assessment upon said owner's unit equal in amount to such pre-emption pursuant to 6.1, and shall enforce such assessment in accordance with paragraphs 6 and 7 hereof.  The proceeds of such assessment or lien shall then be substituted for the pre-empted insurance proceeds.

9.    MAINTENANCE, REPAIR AND RESTORATION

9.1  General:  Notwithstanding the provision for insurance in Paragraph 8, the Association and the owners are under the obligation of maintenance, repair and restoration set forth as follows; provided, however, that all expenses to the extent covered by insurance shall be paid from such insurance proceeds.

9.2  Owners:  The owner of each residence unit shall maintain at his sole expense, and in the case of damage or destruction shall repair or restore the interior surface of the walls, ceilings, floors, windows and door frames, fireplaces and any fixtures attached to and extending beyond the interior surface of his condominium unit including all window and door glass except as specified in 9.3(c).  All such repair or restoration shall be done substantially in accordance with the original plans and specifications, or in accordance with any modification thereof as approved by the Association. In the event an owner shall fail to properly maintain, repair or restore such areas after written demand from the Association, then the Association shall have the right to cause said work to be done with the cost thereof to be assessed against the owner.  Notwithstanding anything to the contrary, any loss covered by insurance shall be repaired or restored by the Association from the insurance proceeds.

9.3  The Association:

(a)  The Association shall have the obligation to maintain at its expense the common areas including all portions of the buildings (including but not limited to bearing walls,

columns, floors, roofs, foundations, elevator equipment and
shafts, central heating, tanks, pumps and other central ser-
vices, pipes, ducts, flues, conduits, wires and other utility
installations) in which the condominium units are located
(except that portion that the owners are required to maintain),
all recreational buildings and facilities, all parking areas,
roads and driveways and all landscaped and open areas and
all furniture, furnishings, equipment and supplies required
for the operation of the common area.  Such maintenance shall
include prompt and efficient removal of snow from all parking
areas, driveways and sidewalks, and the planting and cultiva-
ting in a neat and attractive manner all landscaping during
the applicable seasons of the year.  In case of damage or
destruction at its expense, promptly after such damage or
destruction occurs in accordance with the original plans and
specifications unless 51% or more of both classes of members
approve a material deviation or modification thereof.

      (b)  The expense of any extraordinary maintenance
(which shall be determined by the Association) or any repair or
restoration caused by the intentional or negligent acts of an
owner or a member of his family or a person occupying his condo-
inium unit, or any licensee, or invitee or guest of said persons,
all shall be assessed against the owner.

    9.4  Cost Allocation:  In the event the work required
to maintain or to repair or restore damage or destruction involves
work that is the responsibility of owner and the Association as
provided in 9.2 and 9.3, then all of such work shall be directed
by the Association, with the expense to be allocated between
owner and the Association pursuant to 9.2 and 9.3.  If more than
one owner is involved, the expense to be paid by each owner shall
be conclusively apportioned by the Association.

9.5   Liens:   If the Association undertakes any work which 9.2 requires an owner to undertake, or any work which 9.3 hereof requires the Association to undertake at the expense of the owner, the Association shall assess the unit ownership of the owner for such work and shall so inform the owner thereof in writing; provided, however, that the assessment shall be reduced by the amount of any insurance proceeds paid to the Association for such work as a result of damage to or destruction of the residence unit involved.   Such assessments shall be a lien upon the condominium unit and may be foreclosed, as set forth in paragraphs 6 and 7.

9.6   Approval of Plans:   No work provided for in this article or elsewhere in this Declaration shall be commenced until complete plans and specifications for the work shall have been approved by the Association.   The Association shall have the right to supervise when and how the work is conducted in order to minimize any interference with the peaceful enjoyment by the other owners of their condominium units.

9.7   Waiver of Approval:   Approval by the Association of any plans or specifications shall not prevent the Association from withholding its approval of an identical plan or specification, or part thereof, when subsequently or additionally submitted for approval by the same or any other owner.

9.8   Non-liability:   Approval by the Association of any plan or specification submitted to it for approval shall not cause the Association, or its members, to be liable in any way to any person.

9.9   Destruction:   If 75% or more of the gross square foot area of any one of the buildings in which the residence units are located is substantially or totally destroyed, the Association shall obtain bids from at least three contractors to restore the improvements as nearly as possible to their condition immediately prior to their destruction, excluding any improvements added by individual owners.   As soon as possible thereafter, and after a determination has been made of the amounts available from any insurance policies (provided such a determination can be made without any unreasonable delay), the Association shall hold a special meeting to consider the bids.   Unless owners holding in aggregate more than a 75%

interest in the common elements are opposed to repair or restoration of the project, the project shall be restored according to the provisions of this paragraph 9. In the event the owners vote not to restore the buildings or structures in the project that have been destroyed, then any portion of the project not destroyed shall have debris and materials removed with the area left in a clean, safe and orderly manner, so that it presents an attractive and harmonious appearance for the remaining improvements. In the event all of the buildings and structures are destroyed and the owners vote not to restore, then the property shall be cleared of all debris and materials and shall be left in a clean, safe and orderly condition. The property and any improvements remaining thereon shall be held or disposed of by the Association, on behalf of all members, in the manner and on such terms and conditions as shall be approved by a vote of 67% or more of both classes of members. Any transfer of the property pursuant to this 9.9 shall be effective as to the interest of all owners in the property upon the execution of a written instrument signed by owners representing the necessary 67% of the membership of the Association.

9.10 Termination: If after 50 years from the time the Declaration is recorded the project is obsolete and uneconomic the unit owners holding 75% or more of an interest in the common elements may oppose the repair or restoration of the project and may dispose of the project on behalf of all members in the manner and on such terms and conditions as they elect. Such a transfer of property shall be effective as to the interest of all owners in the property upon the execution of a written instrument signed by the owners representing the necessary 75% interest in the common elements. Proceeds will be distributed according to percentage interests in the common elements.

10.    EASEMENTS

10.1 Encroachments: There is reserved for the benefit of each residence unit and the common area a reciprocal easement of maintenance and use to which the entire project shall be subject for any and all encroachments attributable or resulting from construction errors, lateral shifting or settlement or any other cause and any and all encroachments resulting from construction of sewer, water, storm drainage, gas and electrical lines and other utilities.

10.2  Ingress, Egress and Support:  A nonexclusive easement for ingress, egress and support throughout the common area is appurtenant to each residence unit and the common area in subject to such easement.

10.3  Entry and Access of Association:  There is reserved to the Association an easement, to which the entire project, including the residence unit shall be subject, of entry and of access for the performance by the Association and persons and organizations authorized by it, generally, of its rights and duties as provided in this Declaration.  Entry into the residence of an owner pursuant to this easement shall be restricted to reasonable times and must be preceded by reasonable notice to occupant, unless entry is required by an emergency.

10.4  Utilities:  There is reserved an easement over, under and through each residence unit and the common area for installation, maintenance and repair of each and every utility service, including but not limited to sewage, water, electricity, gas, telephone and television service for each residence unit and the common area.  Provided, however, that the exercise of the easements reserved herein shall not result in damage to existing improvements, unless adequate compensation is made for any such damage.

10.5  Easement:  There is reserved for the benefit of each residence unit an exclusive easement to use any balcony, deck or patio located contiguous to a residence unit

11.    ROADS AND PARKING SPACES

11.1  General:  Declarant shall set aside within the common area at least one parking space for each unit and such private roads and driveways as are necessary to provide vehicular access from such parking spaces to any public road.  Each parking space shall be of suitable size for the parking of one automobile.  Each parking space may be used only for the parking of automobiles and such other vehicles and objects as shall be permitted by rules adopted by the Association.  The use of the parking areas, roads and driveways shall be subject to such rules as the Association may adopt.  The parking spaces allocated to each unit ownership shall entitle the owner or owners thereof to the exclusive right to use the space so allocated.  Any remaining parking spaces may be allocated to owners by the developer.  After the developer has sold all its condominium units, the Association shall have the right to allocate any unallocated parking spaces in such manner and subject to such

charges as the developer or Association shall determine, or may be retained by the Association for guest parking.

Each parking space assigned to a unit is an appurtenance to such unit and may not be transferred independently of the transfer of the unit.

11.2  Maintenance of Roads and Parking Spaces:  The cost of maintaining the roads, driveways and parking spaces shall be paid by the Association.  A single parking space per unit shall never be severed from the unit ownership to which it has been allocated, except that the owner or owners involved may permit other owners to use any such space, provided that such permission be revocable at any time without notice.

12.    TRANSFER OR LEASE OF UNIT

12.1  Right of First Refusal:  Any unit owner excluding Declarant who has solicited and received a bonafide offer for the sale or lease of his unit, hereinafter called an outside offer which he intends to accept shall notify the Association in writing of his intention, the terms of the offer, the name and address of the proposed buyer or lessee and he shall offer to sell or lease such unit, to the Association, or its designee, on the same terms and conditions, hereinafter called the "offer." The Association or its designee shall have thirty (30) days to exercise its right of first refusal by approving or disapproving the outside offer.

In the event it disapproves the outside offer it or its designee must at the same time accept the offer.  The Association or its designee shall have thirty (30) days after said acceptance to close the sale or lease.  At the closing, the unit owner, if such apartment is to be sold, shall convey same to the Association or its designee, on behalf of all other unit owners by a grant deed and shall pay all county taxes arising out of such sale.  In the event of a lease, the owner shall execute and deliver to the Association or to its

designee, as tenant on the terms and conditions contained in the outside offer. Any purchaser or lessee shall agree to be subject to the provisions of the Declaration and Bylaws.

12.2  Right of Lease Termination: The Association shall have the power to terminate any lease between a unit owner and his lessee and to bring an action in the name of the unit owner against said lessee, in the event of default by the lessee in the performance of such lease.

12.3  Null and Void Transactions: Any purported sale or lease of a unit owner in violation of this paragraph shall be voidable at the election of the Association.

12.4  Approval of Association: The Association shall not exercise any option hereinabove set forth to purchase or lease any apartment unit without prior approval of sixty-seven percent (67%) of the unit ownership.

12.5  Certificate of Termination of Right of First Refusal: A certificate, executed and acknowledged by the secretary of the condominium, stating that the provisions of 12.1 of this paragraph have been met by a unit owner, or have been duly waived by the Association, and that the rights of the Association thereunder have terminated, shall be conclusive upon the Association and the unit owners in favor of all persons who rely thereon in good faith. Such certificate shall be furnished upon request to any unit owner who has in fact complied with the provisions of 12.1 or in respect to whom the provisions of such section have been waived.

12.6  Financing of Purchase of Condominium Units by Association: Acquisition of condominium units by the Association, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Association, or if such funds are insufficient, the Association may levy an assessment against each unit owner in proportion to his ownership in the common elements, as a common charge, which assessment shall be enforceable in the same manner as provided in Paragraph 7. Alternatively, the Association may borrow money to finance the acquisition of such condominium unit, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the condominium unit to be acquired by the Association.

12.7  Exceptions:  The provisions of this paragraph shall not apply with respect to any sale, conveyance or lease by a unit owner of his unit to his spouse or to any of his children or to his parent or parents or to his brothers or sisters, or any one or more of them, or to a condominium unit owned by the Declarant, or to the acquisition or sale of a condominium unit by a mortgagee herein authorized who shall acquire title to such unit by foreclosure or by deed in lieu of foreclosure.  However, the provisions of this paragraph shall apply with respect to any purchaser of such condominium unit from such mortgagee.

12.8  Gifts and devises:  Any unit owner shall be free to convey or transfer his condominium unit by gift, or to devise his condominium unit by will, or to pass the same by intestacy, without restriction.

12.9  Waiver of Right of Partition with Respect to Condominium Unit Acquired by Association:  In the event that any unit shall be acquired by the Association, or its designee, on behalf of all unit owner as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such condominium unit.

12.10  Payment of Assessments:  No unit owner shall be permitted to convey, mortgage, pledge, hypothecate, sell, or lease his condominium unit unless and until he shall have paid in full to the Association all unpaid common charges theretofore assessed by the Association against his unit and until he shall have satisfied all unpaid liens against such unit, except permitted mortgages.

12.11  Declarant Right of Purchase:  The aforesaid subparagraphs of Paragraphs 12 except for 12.9 and 12.10 will not apply to the sale of any condominium unit which occurs twelve months from the date said unit is conveyed by Declarant to the first purchaser (grantee) of said unit.  If, during this twelve month period a grantee desires to sell his unit, Declarant shall have the option to purchase from the aforesaid grantee his condominium unit at a price no greater nor less than five percent (5%) above the said grantee's purchase price.  Declarant shall bear the closing costs of the escrow, title insurance and any stamps to he attached to the deed in accordance with the requirements of any lawful authority.  Any purported sale by said grantee in violation of this subparagraph

shall be voidable at the election of the Declarant. If the Declarant declines to purchase a condominium unit as provided for herein, Declarant will provide the grantee who wishes to sell his unit with a certificate certifying that Declarant has declined to exercise its right of purchase under this subparagraph.

13.    PROFESSIONAL MANAGEMENT

13.1  Management:  The Association shall employ a full time professional management company or a full time professional manager experienced in the management of condominiums similar to the property to manage the property.

13.2  Duties:  The manager employed by the company shall supervise and be responsible for all maintenance of the common area, the distribution of heating and air conditioning, the billings for heating and air conditioning and the general administration of the property.

13.3  Fees:  Each unit shall pay a management fee in an amount of not less than $13.00 per month or such other amount as the Association shall determine.

13.4  Sale or Lease of Units:  No unit may be sold, leased or rented or offered for sale, lease or rental except through the manager of the property or such real estate broker as the manager may approve in writing.  The approval of any real estate broker shall be conditioned upon such broker's agreement to sell, lease or rent such upon such terms and conditions as are in the judgment of the Association in the best interests of the owner of the entire property.

13.5  Rentals:  Any unit leased or rented shall be under the direct supervision of the manager.  All rentals shall be collected by the manager and paid to the owner less the cost of repairs made to the unit, a reasonable management fee, and the monthly association dues.

13.6  Removal of Manager:  The Association may remove the manager and the manager may resign at any time without cause or payment of a fee upon ninety (90) days notice in writing. No contract for management shall extend beyond three (3) years.

14.    MORTGAGEE PROTECTIONS:  The following special provisions hereinafter set forth are and are intended to be controlling over any of the other conditions contained in these covenants,

conditions and restrictions that may be in conflict with the following special provisions:

(a) A first mortgagee, upon request, is entitled to written notification from the homeowners' association of any default in the performance by the individual unit mortgagor of any obligation under the condominium documents which is not cured within sixty (60) days.

(b) Any first mortgagee who obtains title to the unit pursuant to the remedies provided in the mortgage, or fore-closure of the mortgage, or Deed (or assignment) in Lieu of foreclosure, shall be exempt from any "right of first refusal."

(c) Any first mortgagee who obtains title to the unit pursuant to the remedies provided in the mortgage or fore-closure of the mortgage shall not be liable for such unit's unpaid dues or charges which accrue prior to the acquisition of title to such unit by the mortgagee.

(d) Unless at least seventy-five percent (75%) of the first mortgagees (based upon one vote for each first mortgage owned), or owners (other than the sponsor, developer, or builder) of the individual condominium units have given their prior written approval, the condominium owners assoc-iation shall not be entitled to:

(1) by act or omission, seek to abandon or terminate the condominium regime;

(2) change the pro rata interest or obli-gations of any individual unit for (i) purpose of levying assessments or charges or allocating distri-butions of hazard insurance proceeds or condemnation awards, or (ii) determining the pro rata share of ownership of each unit in the common elements;

(3) partition or subdivide any condominium unit;

(4) by act or omission, seek to abandon, partition, subdivide, encumber, sell, or to transfer, the common elements. The granting of easements for public utilities or for other public purposes con-sistent with the intended use of the common elements by the condominium project shall not be deemed a trans-fer within the meaning of this clause;

"(5)   use hazard insurance proceeds for
losses to any condominium property (whether to units
or to common elements) for other than the repair,
replacement or reconstruction of such improvements,
except as provided by statute in case of substantial
loss to the units and/or common elements of the
condominium project.

(e)   First mortgagees shall have the right to
examine the books and records of the condominium owners assoc-
iation for the condominium project.

(f)   The Association shall give notice in writing
to the Federal Home Loan Mortgage Co. of any loss to or taking
of the common area of the project if such loss or taking exceeds
$10,000.00 or damage in excess of $1,000.00 to a condominium
unit covered by a mortgage or deed of trust purchased in whole
or in part by Federal Home Loan Mortgage Co.

(g)   Condominium dues or charges shall include an
adequate reserve fund for maintenance, repairs and replacement
of those common elements that must be replaced on a periodic
basis, and shall be payable in regular installments rather
than by special assessments.

(h)   All taxes, assessments and charges which may
become liens prior to the first mortgage under local law shall
relate only to the individual condominium units and not to the
condominium project as a whole.

(i)   No provision of the Lakeside Plaza Condominium
Association Articles of Incorporation or of this Declaration
of Covenants, Conditions and Restrictions for Lakeside Plaza, or
of any Bylaws or any similar instruments pertaining to this
project shall give a condominium unit owner or any other party
priority over any rights of first mortgagees of condominium
units pursuant to their mortgages in the case of a distribution
to condominium unit owners of insurance proceeds of condem-
nation awards for losses to or taking of condominium units
and/or common elements.

15.   <u>MISCELLANEOUS</u>

15.1   <u>General</u>:  To the extent that all or any portion
of the subject property shall heretofore have been made subject
to any conditions or restrictions of use by a recorded instru-

HOY & MILLER CHARTERED

ment or instruments, the Association and each member shall abide by any such condition or restriction. Nothing herein contained is intended to abrogate any existing valid restrictions or covenants concerning the subject property.

15.2  Acceptance of Provisions by Grantees:  The Association and each grantee hereafter of any part or portion of or interest in the project, and any purchaser under any grant or contract of sale, or any lessee under any lease covering any part or portion of or interest in the project, accepts the same subject to all of the restrictions, conditions, covenants, reservations, liens and charges, and the jurisdiction rights and powers of the Association and Declarant provided for in this Declaration.

15.3  Conclusiveness of Records:  A certificate of the Secretary of the Association, or in his absence, or any two Directors of the Association, shall be conclusive proof of all matters contained in the certificate when the certificate shall relate to acts or non-acts of the Association, its Board of Directors, or any committee or agent of the Association, and when the certificate shall be prepared for or delivered to any title insurer or land abstractor for use in a search, in preparing an abstract or in insuring title in any unit ownership for other interest therein, or lien thereupon.

15.4  Interpretation of Restrictions:  In interpreting and applying the provisions of this Declaration they shall be held to be minimum requirements adopted for the promotion of the health, safety, comfort, convenience and general welfare of the owners and occupants of the property affected by this Declaration.  It is not the intent of this Declaration to interfere with any provisions of law or ordinance or any rules, regulations or permits previously adopted or issued or which may be adopted or issued pursuant to law relating to the use of buildings or premises; nor is it the intent of this Declaration to interfere with or abrogate or annul easements, covenants or other agreements between parties; provided, however, that where this Declaration imposes a greater restriction upon the use or occupancy of any unit, or upon the construction of buildings or structures, or in connection with any other matters that are imposed or required by such provisions of law or ordinances or by such rules, regulations or permits or by such easements, covenants and agreements, then in that case the provisions of this Declaration shall control.

15.5  Construction and Validity of Restrictions:  All of said restrictions, covenants, conditions, reservations, liens and charges contained in this Declaration shall be construed together; but if it shall at any time be held that any one or more of such restrictions, conditions, covenants, reservations, liens or charges or any part thereof, is invalid or for any reason becomes unenforceable, no other restrictions, conditions, covenants, reservations, lien or charge, or any part thereof, shall be thereby affected or impaired.

15.6  Assignment of Powers:  Any and all rights and powers of Declarant provided for in this Declaration, and any modification or amendment hereof, may be delegated, transferred, assigned, conveyed or released by Declarant to the Association and the Association shall accept the same upon the recording of a notice thereof, and the same shall be effective for the period and to the extent stated therein.

15.7  Waiver and Exemption:  The failure by the Association or Declarant or of any owner of any unit ownership included in the property or any other person, to enforce any of the restrictions, conditions, covenants, reservations, liens or charges to which said unit ownership or any part thereof is subject, shall in no event be deemed to be a waiver of the right to do so thereafter or to enforce any other restriction, condition, covenants, reservation, lien or charge.

15.8  Titles:  All titles used in this Declaration, including those of paragraphs and subparagraphs, are intended solely for convenience of reference and the same shall not nor shall any of them affect that which is set forth in such paragraph or subparagraph nor any of the terms or provisions of this Declaration nor the meaning thereof.

15.9  Amendment:  This Declaration shall be for a term of twenty (20) years after the date of recordation, and shall be extended automatically thereafter for successive ten-year periods unless the owners representing 75% or more interest in the common element vote or give their written consent, at least thirty (30) days prior thereto, to terminate this Declaration upon the expiration of any current period.  This Declaration may be amended, except Paragraphs 4 and 11, but not terminated, at any time, upon the vote or consent of not less than the above 75% given after reasonable notice.  This Declaration may not be amended to place any restrictions on the free alienability of any condominium units owned by Declarant.

Any amendment must be recorded and upon recording shall be binding upon every owner and every unit ownership whether the burdens thereon are increased or decreased thereby, and whether the owner of each and every unit ownership consents thereto or not.

16.     ANNEXATION OF ADDITIONAL PROPERTY:

Declarant is the owner of Lakeside Plaza Condominiums Phase II located immediately adjacent to the property. Said Phase II may be annexed to and become a part of the property subject to this Declaration and part of the association at any time within four years from the date hereof upon notice of Declarant or a majority of the owners of Phase II and the recording with the Washoe County Recorder of a declaration of intent to subject the property to these Declarations of Covenants, Conditions and Restrictions.

IN WITNESS WHEREOF, the undersigned has caused the Declaration to be executed this 2nd day of April, 1979.

DILORETO CONSTRUCTION AND
DEVELOPMENT COMPANY

By _____
Perry M. DiLoreto, President



STATE OF NEVADA    )
                   ) ss
COUNTY OF WASHOE   )

On this 2ND day of April, 1979, personally appeared before me, a Notary Public, Perry M. DiLoreto, President of DiLoreto Construction and Development Company, who acknowledged that he executed the within instrument on behalf of DiLoreto Construction and Development Company.

_____
Notary Public

HOY & MILLER, CHARTERED

Page Thirty

EXHIBIT "C"

# Owner Ledger

| | |
|---|---|
| Date: | 01/18/07 |
| Owner Code: | 366 |
| Property: | 033 |
| Unit: | 366 |
| Status: | Current |
| Fees: | 143.09 |
| Deposit: | 0.00 |
| Move In Date: | 11/15/05 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O): | (408) 854-5698 |
| Tel# (H): | |

Moulton, Sheryl A.
225 Crossroads Blvd., #164
Carmel, CA 93923

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 0.00 |
| 11/15/05 | Transfer fee | 150.00 | | 150.00 |
| 11/28/05 | chk# 37200  Stewart Title | | 287.34 | -137.34 |
| 12/01/05 | Fees | 137.34 | | 0.00 |
| 01/01/06 | Fees | 137.34 | | 137.34 |
| 01/05/06 | chk# 1901 | | 137.34 | 0.00 |
| 02/01/06 | Fees | 137.34 | | 137.34 |
| 02/02/06 | chk# 1916 | | 137.34 | 0.00 |
| 03/01/06 | Fees | 137.34 | | 137.34 |
| 03/07/06 | chk# 1922 | | 137.34 | 0.00 |
| 03/30/06 | chk# 1932 | | 137.34 | -137.34 |
| 04/01/06 | Fees | 137.34 | | 0.00 |
| 04/28/06 | chk# 1937 | | 137.34 | -137.34 |
| 05/01/06 | Fees | 137.34 | | 0.00 |
| 05/12/06 | Copies of info requested | 56.00 | | 56.00 |
| 06/01/06 | Fees | 137.34 | | 193.34 |
| 06/09/06 | chk# 1920 | | 193.34 | 0.00 |
| 07/01/06 | 2006 Special Assessment | 1,703.75 | | 1,703.75 |
| 07/01/06 | Fees | 143.09 | | 1,846.84 |
| 07/07/06 | chk# 1958 | | 285.07 | 1,561.77 |
| 07/24/06 | 2nd Notification Postage & Admin Fees - | 14.64 | | 1,576.41 |
| 08/01/06 | Fees | 143.09 | | 1,719.50 |
| 08/09/06 | chk# 1964 | | 285.07 | 1,434.43 |
| 08/18/06 | Notice of hearing & postage fees | 20.64 | | 1,455.07 |
| 09/01/06 | Fees | 143.09 | | 1,598.16 |
| 09/13/06 | chk# 1968 | | 143.09 | 1,455.07 |
| 10/01/06 | Fees | 143.09 | | 1,598.16 |
| 10/12/06 | chk# 1978  Oct06 dues | | 143.09 | 1,455.07 |
| 11/01/06 | Fees | 143.09 | | 1,598.16 |
| 11/11/06 | Late Fee | 10.00 | | 1,608.16 |
| 12/01/06 | Fees | 143.09 | | 1,751.25 |
| 12/11/06 | Dec06 Late Fee | 10.00 | | 1,761.25 |
| 12/12/06 | chk# 1992  November assessment | | 143.09 | 1,618.16 |
| 01/01/07 | Fees | 143.09 | | 1,761.25 |
| 01/10/07 | chk# 1995  dec06 dues | | 143.09 | 1,618.16 |
| 01/11/07 | Jan07 Late Fee | 10.00 | | 1,628.16 |
| | | | | CONTINUED |

# Owner Ledger

| | |
|---|---|
| Date: | 01/18/07 |
| Owner Code: | 366 |
| Property: | 033 |
| Unit: | 366 |
| Status: | Current |
| Fees: | 143.09 |
| Deposit: | 0.00 |
| Move In Date: | 11/15/05 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O): | (408) 854-5698 |
| Tel# (H): | |

Moulton, Sheryl A.
225 Crossroads Blvd., #164
Carmel, CA  93923

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 1,628.16 |
| 01/12/07 | Del Letter | 10.00 | | 1,638.16 |

| Current | 30 Days | | 60 Days | 90 Days | Amount Due |
|---|---|---|---|---|---|
| 163.09 | 10.00 | | 10.00 | 1,455.07 | 1,638.16 |

EXHIBIT "D"

ORIGINAL

1  GAYLE A. KERN, LTD.
   GAYLE A. KERN, ESQ.
2  Nevada Bar # 1620
   5421 Kietzke Lane, Suite 200
3  Reno, Nevada 89511
   Telephone: (775) 324-5930
4  Facsimile: (775) 324-6173
5  E-mail: gaylekern@kernltd.com

6  Attorneys for Lakeside Plaza Condominium Association,
7       a Nevada non-profit corporation

8                      STATE OF NEVADA

9        IN THE DEPARTMENT OF BUSINESS AND INDUSTRY

10                    REAL ESTATE DIVISION

11  In re the Alternate Dispute           NRED CONTROL NO.: 07-21
12  Resolution claim of:

13  CARL FRIEDMAN,
14                                                    AWARD
        Claimant/Counter-Respondent
15

16      vs.

17  L A K E S I D E    P L A Z A
    CONDOMINIUM ASSOCIATION, a
18  Nevada non-profit corporation;

19      R e s p o n d e n t / C o u n t e r -
20      Claimants.
                                            /
21

22      Pursuant to NRS § 38.330(2), a non-binding arbitration was conducted on May 11, 2007.

23  The Arbitrator entered his Decision, reserving jurisdiction to enter a final Award that would

24  include Findings of Fact, Conclusions of Law and Award of Attorney's Fees.

25      Those present at the hearing included Claimant Carl Friedman.  Present for the

26  Respondents were Frank Perau and Respondent's attorney, Gayle A. Kern, Esq. Also present was

27  Kevin Berg pursuant to a subpoena served by Mr. Friedman.

28

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE (775) 324-5930

The Arbitrator considered the evidence presented, testimony, briefs, governing documents and legal argument. Good Cause Appearing, the Arbitrator makes the following Award that shall constitute the Findings of Fact, Conclusions of Law and Award:

1.      The Association is subject to certain governing documents including the Declaration of Covenants, Conditions and Restrictions of DiLoreto Construction and Development Company and amendments thereto("CC&Rs").

2.      Lakeside Plaza is a common-interest community run by its board of directors. It is subject to Chapter 116 of the Nevada Revised Statutes.

3.      The common interest community is managed by the unit owners' association. *See* NRS § 116.3102 et seq.

4.      The powers of the Association include the exercise of any other powers necessary and proper for the governance and operation of the association. *See* NRS § 116.3102(1)(r).

5.      In addition, the Association may exercise all other powers that may be exercised in this state by legal entities of the same type as the Association. *See* NRS § 116.3102(1)(p). As with all corporations, the Board has both express and implied powers.

6.      The Board may act in all instances on behalf of the Association and the Board is governed by the ordinary and reasonable care of directors of a corporation, subject to the business-judgment rule pursuant to NRS § 116.3103.

7.      The dispute centers around a challenge by Friedman to a special reserve assessment approved by the Respondent's Board of Directors without a vote of the membership at large; and certain other claims asserted by Friedman.

8.      In 2006, the Association contracted with Resource Building Consultants to perform a reserve study of the common elements major components which were the responsibility

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE: (775) 324-5930

2

of the Association for the "repair, replacement and restoration" as detailed in NRS 116.3115. The study was conducted by Kenneth R. Rowan, a Certified Master Inspector. The study was presented to the Association for review and it was adopted by the Board of Directors. The study included annual contributions and a special reserve assessment. The Association followed and complied with the recommendations that were proposed in the Reserve Study.

9.      The Association provided a May 31, 2006 letter to the Homeowners explaining the Reserve Study adopted by the Board of Directors and the Association's requirement to correct the failure of past years to adequately fund the reserve. The special reserve assessment was distributed to all units based on each unit's pro rata share to the total of all units as required by the CC&Rs. The Association also provided a legal opinion explaining the statutory requirements of funding the reserve.

10.     Friedman asserts that the governing documents of the Association require that the membership must approve such a special reserve assessment. Lakeside Plaza replies that Chapter 116 of the Nevada Revised Statutes not only authorizes, but requires, the Executive Board to make such an assessment.

11.     The Board's decision to fund the reserves as mandated by the reserve study was a proper exercise of the Board's power.

12.     Funding the reserve is an extremely important duty of any board of a common-interest community. NRS 116.3115 sets forth the applicable requirements concerning the collection and imposition of assessments by an association, including Lakeside Plaza. Paragraph (b) of subsection 2 of NRS 116.3115 provides that an association "shall establish an adequate reserve, funded on a reasonable basis, for the repair, replacement and restoration of the major components of the common elements." Thus, the plain language of paragraph (b) of subsection 2 of NRS 116.3115 requires that an association must establish an adequate reserve to pay for the

3

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE (775) 324-5930

repair, replacement and restoration of the major components of the common elements. It is not a discretionary act.

13.     Nevada Administrative Code 116.415 requires the Board to include in the reserve budget an estimate of the amount of reserve funds necessary in the projected fiscal year and whether there is a difference between the amount of the annual contribution and if so, how the difference is going to be resolved.

14.     Additionally, the executive board of an association must prepare and distribute to each unit's owner a copy of the budget to maintain the reserve required by paragraph (b) of subsection 2 of NRS 116.3115. NRS 116.31151(1). To ensure that the required budgets are based upon sound projections, the executive board of an association is also required to: (1) cause to be conducted at least once every 5 years, a study of the reserves required to repair, replace and restore the major components of the common elements; (2) review the results of that study at least annually to determine if those reserves are sufficient; and (3) make any adjustments it deems necessary to maintain the required reserves. NRS 116.31152 (1). The study must be conducted by a person qualified by training and experience to conduct such a study. NRS 116.31152(2).

15.     The Executive Board is specifically mandated to make the necessary adjustments that it deems necessary, not the general reference to the association, although in such matters the Board of Directors is to act for the Association unless specifically prohibited from doing so and the statue certainly does not place the responsibility for making the adjustment necessary, on the membership at large.

16.     In 2003, in response to a question form Senator Schneider, the Legislative Counsel Bureau affirmed the legal analysis identified above and specifically noted that any limitation in governing documents that would prevent an association from funding its reserve was irrelevant and could not be used to stop such funding. The letter includes the following sentence:

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE: (775) 324-5930

1     "With respect to the applicability of the previously discussed requirements contained in SB 451 and the question of whether the governing documents of an association would supersede those requirements in the event of a conflict, SB451 did not grant any existing associations any exemption from those requirements nor did SB 451 provide that the governing documents of an association would supersede the statutory provisions in the event of a conflict."

There is no mention of a need to take an "advisory" vote or exhaust such possibilities before the Executive Board shall act.

17.    There is a direct conflict between the governing documents requiring a vote of the members and NRS 116.31152(1) requiring action by the Board.  The conflict question is addressed in NRS 116.1206 as follows:

"Any Provision contained in a declaration, by law or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law and any such declaration, by law or other governing document is not required to be amended to conform to those provisions."

18.    The Association lawfully imposed a special reserve assessment.

19.    There was no evidence that any members were afforded different treatment in the special reserve assessment.   The Association allowed its members to pay the special reserve assessment in one lump sum payment or in twelve equal monthly payments.  In addition, there was testimony that one elderly woman requested and was granted the right to pay the reserve assessment over a longer period of time; this accommodation was proper.

20.    Friedman contended that the Board was not lawfully allowed to extend the time allowed for members to vote on General Rules and Regulations and Pool Rules and Regulations.

21.    There is no prohibition on extending the time to vote and the extensions were a lawful exercise of the Board's authority.

22.    There was no evidence presented that the membership was not provided notice of the board meetings.

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE (775) 324-5930

5

23.    Friedman contends that the Association wrongfully compensated its officers.

24.    The Bylaws prohibit compensation of *directors* of the Association for service performed for the Association as a director. Bylaws, Section 4.4. The Bylaws provide that a director may receive compensation for services to the Association *in other capacities than as a director*. *Id.*

25.    In another section of the Bylaws, officers of the Association are discussed. *See* Bylaws, Article VIII. The offices of secretary and treasurer do not need to be members of the board of directors. Bylaws, Section 8.1. There is *no* prohibition to officers receiving compensation.

26.    Pursuant to NRS § 82.131(10), a nonprofit association is allowed to pay reasonable compensation to officers, directors and employees.

27.    The payment of officers as allowed by the bylaws ceased several years ago. Accordingly, the claim is barred by the statute limitations.

28.    Friedman claims that there was a defect in the recall election that was conducted in early 2006.

29.    In accordance with NRS 116.31036 and NRS 116.3108, certain members of Lakeside Plaza caused a petition to be delivered to the Association. Nevada law does not provide for a recall petition to be delivered during a meeting. The requirement is that the petition be served on the Association either by certified mail or personally delivered to the board or to the community manager for the association. *See* NRS 116.3108. Once served with the petition, the Manager immediately confirmed that the Petition for the recall of Jack Bishop had the requisite number of signatures which exceed 10% of the Association membership as required by NRS 116.3108(2).

30.    Thus, the Bishop Recall Petition was presented pursuant to NRS 116.31036 and

6

1  NRS 116.3108 and required that the Association conduct an election to remove Jack Bishop not

2  less than 15 days nor more than 60 days from the date the petition was received by the

3  Association's community manager. The number of signatures required to commence a removal

4  election is 10% of the membership of Lakeside Plaza. The number of voting members in the

5  Association does not exceed 191. Accordingly, the number of members necessary to call for a

6  special meeting and commence a removal election is 19. In fact, there were 35 signatures

7  submitted to the community manager.

8

9      31.    NRS 116.3108(2)(b) succinctly reads that after a valid petition is received, the

10  Board *must* send out written ballots "not less than 15 days or more than 60 days after the date on

11  which the petition is received." The statute does not allow the Board to take a discretionary act

12  when presented with a petition for the removal of a board member. Rather, the statute states that

13  the Board *shall* set the date for the special meeting so that the special meeting is held not less

14  than 15 days or more than 60 days afer the date on which the petition is received and *shall* send

15  out the written ballots. Once again, it is mandatory, not discretionary. The statute also requires

16  that members be afforded 15 days within which to vote.

17      32.    In accordance with its obligations, the Board of Directors scheduled and sent out

18  ballots for the removal of Jack Bishop. Thereafter, the removal election was conducted and there

19  were 78 "yes" votes and 17 "no" votes. The number necessary to remove Bishop was 67.

20      33.    There was no evidence that any retaliatory action was taken against Friedman.

21      34.    The accounting on a homeowner's ledger of various assessments and expenses

22  does not constitute commingling of accounts. The ledger is simply an itemized list of expenses

23  and payments.

24      35.    The Association complied with NRS 116.31175 and other relevant statutes in

25  providing for review or copies of Association records.

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE (775) 324-5930

7

36. The Claimant was not deprived of any written proposals.

37. There was no evidence that there was any work performed in violation of NRS 116.3103(1).

38. There was no evidence that there was any work performed by an unlicenced and uninsured individual.

39. The Association incurred legal fees of $8,898.00 and costs of $3,104.07. It is appropriate that the Association be awarded these legal fees in accordance with its counterclaim.

Accordingly,

IT IS HEREBY ORDERED that an award shall be entered in favor of Lakeside Plaza Condominium Association, Inc. and against the Claimant, Carl Friedman, denying the Claimant's claims.

IT IS FURTHER ORDERED that Claimant Carl Friedman shall pay the sum of $12,097.16 to Lakeside Plaza Condominium Association, Inc. and that such sum shall constitute an assessment against Claimant.

DATED this _9th_ day of ~~September~~ October, 2007.

ARBITRATOR

_Leonard I. Gang_

LEONARD I. GANG, ESQ.

Submitted by:
GAYLE A. KERN, LTD.
5421 Kietzke Lane, Suite 200
Reno, Nevada 89511
(775) 324-5930

_Gayle A. Kern_

GAYLE A. KERN, ESQ.
Nevada Bar No. 1620
Attorneys for Lakeside Plaza
Condominium Association

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE (775) 324-5930

8

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of the law offices of Gayle A. Kern, Ltd., and that on the 17th day of December, 2007, I served the foregoing document(s) described as follows:

**DEFENDANTS' LAKESIDE PLAZA CONDOMINIUM ASSOCIATION, PHILLIP E. FRINK AND PHIL FRINK AND ASSOCIATES, INC. MOTION TO DISMISS**

On the party(s) set forth below by:

X    Placing an original or true copy thereof in a sealed envelope placed for collection and mailing in the United States Mail, at Reno, Nevada, postage prepaid, following ordinary business practices.

    Personal delivery.

    Facsimile (FAX).

    Federal Express or other overnight delivery.

    Reno-Carson Messenger Service.

addressed as follows:

Sheryl Moulton
P.O. Box 223581
Carmel, CA 93922

Dated this 21st day of December, 2007.



AMBER A. GARRELL

SUBSCRIBED & SWORN TO before me this 21st day of December, 2007.

_Notary Public_

TERESA A. GEARHART
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 94-0132-2 - Expires September 10, 2010

GAYLE A. KERN, LTD.
5421 KIETZKE LANE, SUITE 200
RENO, NEVADA 89511
TELEPHONE: (775) 324-5930

12