# EXHIBIT 1

DOC #3611840
01/16/2008 09:46:40 AM
Electronic Recording Requested By
STEWART TITLE RENO
Washoe County Recorder
Kathryn L. Burke - Recorder
Fee: $15.00  RPTT: $0
Page 1 of 2

APN: 019-443-16
No. 10318

When recorded return to:
Phil Frink & Associates, Inc.
401 Ryland St., Ste 202
Reno, Nv 89502
704/289-01

## NOTICE OF CONDOMINIUM HOMEOWNERS ASSOCIATION SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL PHIL FRINK AT 775-324-2567. IF YOU NEED ASSISTANCE PLEASE CALL THE FORECLOSURE SECTION OF THE OMBUDSMAN'S OFFICE, AT 877-829-9907 IMMEDIATELY.**

Owners name(s)/reputed owners name(s): Sheryl A. Moulton

On February 6, 2008, at 10:45 o'clock A.M., Phil Frink & Associates, Inc., under and pursuant to the Notice of Claim of Lien, dated July 5, 2007, executed by Phil Frink & Associates, Inc. as Agent for Lakeside Plaza Condominium Association, such lien being properly assessed/and/recorded pursuant to NRS 116.3116 on July 5, 2007, as Document No. 3551545, of Official Records of Washoe County, State of Nevada in favor of Lakeside Plaza Condominium Association, by reason of the breach of assessment obligation secured thereby, a Notice of Default and Election to Sell was recorded September 20, 2007, as Document No. 3576936, of Official Records of Washoe County, State of Nevada, will sell at public auction to the highest bidder, lawful money of the United States of America, at the Virginia Street entrance of the Washoe County Courthouse located at the corner of Court Street and Virginia Street, Reno, Nevada, without covenant or warrant expressed or implied, regarding title, possession or encumbrances, all right, title and interest of the owner, without equity or right of redemption, the real property situate in the County of Washoe, State of Nevada, described as follows:

PARCEL 1:

Unit 366-B of Lakeside Plaza, Phase 1, a Condominium , according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, as Tract Map No. 1827.

PARCEL 2:

An undivided 1/191st interest in the Common Areas as shown on the official maps of Lakeside Plaza, Phases I and II, a Condominium, filed in the office of the County Recorder of Washoe County, State of Nevada, on April 2, 1979, under Filing No. 597196, Official Records and under Filing No. 597200, Official Records, Washoe County, Nevada

for the purpose of satisfying the assessment obligation secured by said assessment lien, to wit: $2,205.22, plus late charges interest, any subsequent assessments, fees, charges and expenses, advances and costs of the Homeowners Association or it's Agent, under the terms of the assessment lien.

Dated: January 14, 2008

Phil Frink & Associates, Inc., as Agent for
Lakeside Plaza Condominium Association

BY: Phillip E. Frink, President

## DO NOT PUBLISH BELOW THIS LINE

Land Situate in the Reno Judicial Township
Publish Notice of Condominium Homeowners Association Sale in the Reno Gazette Journal
Three times on: January 16, 2008; January 23, 2008 and January 30, 2008

State of Nevada          )
                         )SS
County of Washoe         )

CJ GALLIO-HEDDY
Notary Public, State of Nevada
Appointment Recorded in Washoe County
No: 99-58044-2 - Expires Sept. 8, 2011

This instrument was acknowledged before me on January 14, 2008 by Phillip E. Frink.

NOTARY PUBLIC

# EXHIBIT 2

3398186
11/15/2005
17 of 19

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 10th            day of November, 2005       ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to Century 21(R) Mortgage (SM)

(the

"Lender") of the same date and covering the Property described in the Security Instrument and located at:
1000 BECK DRIVE # 366 RENO, NV 89509

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a
condominium project known as:

LAKESIDE PLAZA

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium
Project (the "Owners Association") holds title to property for the benefit or use of its members or
shareholders, the Property also includes Borrower's interest in the Owners Association and the uses,
proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or
any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and
(iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments
imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to
Lender and which provides insurance coverage in the amounts (including deductible levels), for the
periods, and against loss by fire, hazards included within the term "extended coverage," and any other
hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance,

MULTISTATE CONDOMINIUM RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-8R (0008)            Form 3140 1/01
Page 1 of 3            Initials:
VMP MORTGAGE FORMS - (800)521-7291

3308166
11/15/2005
18 of 18

then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.



-8R (0008)                     Page 2 of 3                  Initials: SM                Form 3140 1/01



3398166
11/15/2005
19 of 19

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.



Sheryl A Moulton                    _____ (Seal)          _____ (Seal)
                                    -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                  -Borrower

-8R (0008)                    Page 3 of 3                    Form 3140 1/01

# EXHIBIT 3

5.8  Dedication:  The Association shall have the
authority and power to dedicate, to sell, or to transfer any
interest to all or any part of the common area to any public
agency authority or utility to be used for such purposes and
subject to such conditions as shall be deemed to be necessary
or beneficial to the Association.  No such dedication, sale or
transfer shall be effective unless an instrument agreeing to
such dedication, sale or transfer has been signed by 67% or
more of both classes of members of the Association.

6.    ASSESSMENTS

6.1  Annual Assessments:  Promptly after the conveyance
by Declarant of the first condominium unit to an owner and not
less than 30 days prior to the beginning of each calendar year
thereafter, the Association shall estimate the net cash require-
ments for the balance of the calendar year or the ensuing year,
as the case may be, necessary for the Association to operate and to
maintain the property (including maintaining reasonable reserves)
and to perform all of its duties in accordance with this Dec-
laration.  Each condominium unit shall be assessed for its pro
rata share of the amount so estimated.  The pro rata share of each
condominium unit shall be in direct proportion to what each
condominium unit bears to the total of all unit ownerships in
the property.  Any condominium unit not yet conveyed to an
owner by Declarant shall be included in computing the pro rata
share of each owner, with Declarant paying the amount of such
assessment until it is conveyed to an owner.  After the initial
assessment, maximum annual assessments may be increased 25%
above the annual assessment for the previous year without a vote
of the members of the Association.  Any increase in excess of
25% shall require the vote of 51% or more of both classes of
members.

6.2  Special Assessments:  In addition, if after establish-
ing the amount of the annual assessment the Association determines
the annual assessment is inadequate or anticipated to be inadequate
to pay the costs of operating and maintaining the property, or if
the Association determines that extraordinary costs applicable
to one or more years should be or have been incurred for the
purpose of paying for the costs of rebuilding, remodeling, removing
or constructing capital improvements which are the obligation of
the Association, the Association may from time to time during a
year establish a special assessment to remedy any such inadequacy
or to pay the cost of such capital improvement, and each condo-
minium unit shall be assessed for its pro rata share of any
such special assessment in the manner provided in 6.1.  In the
event any special assessment, except a special assessment re-
quired as a result of the restoration of damage and destruction

597801

HOY & MILLER, CHARTERED
ATTORNEYS AT LAW
RENO AND ELKO, NEVADA

Page eleven

by the Association pursuant to 9.3 and 9.9, when added to the
annual assessment causes the total annual assessment for said
calendar year to be more than 25% higher than the annual assess-
ment for the prior year, the vote or written consent of both
classes of members shall be required for such special assessment;
otherwise the special assessment may be established without a
vote of the members. The amount of any special assessment
for capital improvements in the prior calendar year shall be
excluded from the total of annual assessments for the prior
calendar year in determining whether a 25% increase in the
annual assessment over the preceding year has occurred pur-
suant to 6.1.

6.3  Special Assessments: Each condominium unit shall
also be assessed from time to time for all fines and penalties
to which its owner is subject as a result of violation of the
terms of this Declaration or any rules prescribed by the
Association, and for any other liability, indebtedness or
other obligation of the owner to the Association arising under
9.5 under any other provision of this Declaration or otherwise.

6.4  Costs and Interest Assessment: In addition to
the foregoing assessments, each condominium unit shall also be
assessed from time to time costs (including reasonable attorney
fees) incurred in collecting the foregoing assessments and
interest at the legal rate per year on such assessments from
the date due until paid in full.

6.5  Payment: The Association shall inform each owner
in writing of all assessments against his condominium unit. The
annual assessment shall be payable in equal monthly installments
in advance, on the first day of each month of the year to which
such assessment pertains. Special and individual assessments
shall be payable in full on the first day of the first month
next following the date on which the owner is informed of such
assessment, unless other provision is made therefor. Each
assessment shall become delinquent 10 days after it is due.
All such assessments shall be paid to the Association or to any
commercial banking institution designated by the Association to
handle the receipt and disbursement of all such funds pursuant
to the direction of the Association. The Association, upon
request and for a reasonable charge, shall furnish an owner a
certificate executed by an officer setting forth the status of
payment of all assessment against an owner.

6.6  Procedure for Assessment Requiring Vote of Members:
Any assessment requiring the vote of the members of the Associ-
ation shall be done at either the annual or special meeting of
the members pursuant to the Bylaws of the Association.

507801

HOT & MILLER, CHARTERED
ATTORNEYS AT LAW
RENO AND ELKO, NEVADA

Page twelve

# EXHIBIT 4

# HOA bill, see you in 2009

**By Joe Schoenmann**
*Published in the Sun on June 16, 2007*

Gov. Jim Gibbons' veto Friday of legislation governing homeowners associations means that the 2009 legislative session will begin with a vote to overturn his decision.

Sen. Mike Schneider, a Las Vegas Democrat who co-sponsored the bill, predicted the veto will easily be overridden. Sixty-one of 63 legislators voted to pass the bill shortly before the 2007 Legislature adjourned.

"It'll be a hell of a way to start a session," said Schneider, who said the governor called him early Friday to tell him about the veto. Gibbons will try to get Republican lawmakers to uphold the veto, "but his Republicans are flipping on him in the Assembly for sure," Schneider said.

Phone calls by the Sun to the governor's office Friday were not answered.

Schneider said the governor told him he vetoed the bill because of a provision that would allow
homeowners to install exterior shutters on their homes.

Those shutters would amount to a "taking" from other homeowners because the underlying law says that condo owners also collectively own the airspace in the condominium complex. So if a homeowner puts up shutters outside his own windows, it's tantamount to putting them up in someone else's airspace.

Schneider called that explanation a smokescreen. The real reason for the governor's veto, he said, is "pressure from campaign donors. He sold the people of Nevada down the drain — and he's (angered) a lot of legislators in the process."

The veto kills an amendment to the existing law that would have allowed HOA members to install exterior shutters without the association's approval. It also eliminates a revision that would have given HOA executive boards power to levy fees for reserve funds without a vote of all members. A third item would have barred security guards from using radar guns to stop and ticket speeders in gated communities.

Schneider said the governor also killed some new safeguards against the misuse of HOA funds. One required HOA board members to get two signatures, instead of one, to write checks on association funds. The other required association managers to be bonded, so that if money went missing, there would be a way to recoup it.

Schneider has said that Gibbons had told him he would sign the bill. But after the Sun wrote about the bill June 8, angry homeowners began urging a veto.

Joe Schoenmann can be reached at 259-4096 or at joe.schoenmann@lasvegassun.com.

# EXHIBIT 5

**reviewjournal.**com



**PRINTTHIS**

Powered by **Clickability**

Jul. 13, 2007
Copyright © Las Vegas Review-Journal

# Decision changes HOA powers

## Ruling upholds homeowners' right to vote on actions

By SEAN WHALEY
REVIEW-JOURNAL CAPITAL BUREAU

CARSON CITY -- An arbitrator's decision that says homeowners associations have to get a favorable vote from residents to implement special assessments could have far ranging implications for the 1.2 million Clark County residents who live in such communities, a lawmaker said Thursday.

"This is big," said Sen. Mike Schneider, D-Las Vegas, who has worked on homeowner association issues in the Legislature for years.

The problem is that state law requires associations to have a fully funded reserve for capital improvements, which creates the need for special assessments, but there is also the requirement in many associations that homeowners be allowed to vote, he said.

The two requirements conflict if homeowners vote no on special assessments. Schneider disagreed with the ruling, saying the reserve requirement is critically important to maintain the communities.

It is even tougher in the case of the arbitration decision in the dispute between Jonathan Friedrich and the Rancho Bel Air Homeowner's Association because the rules require a two-thirds vote, he said.

"It's almost impossible to get a two-thirds vote," Schneider said.

The dispute stems from a vote last year by the homeowners association board to implement a $20 a month special assessment starting Jan. 1 to fund a reserve for capital projects.

Friedrich objected, saying the association's rules required a vote of the homeowners, with a yes from two-thirds of the residents to implement the assessment.

The board disagreed, citing a state law that it said overrode the association rules.

But in the decision issued Friday, Arbitrator Dee Newell ruled for Friedrich, saying the board is required to put the matter to a vote of the homeowners.

"I'm ecstatic that I won my battle with my homeowners association," Friedrich said. "It's been a long, hard, nasty fight."

The decision does not impact standard homeowners association fees.

Schneider said a bill that would have cleared up the issue by allowing association boards to impose such fees passed the Legislature but was vetoed by Gov. Jim Gibbons, he said.

Even so, Schneider said legislative counsel has issued a legal opinion that says association boards can implement special assessments without a vote of residents, a view that conflicts with the arbitrator's decision.

But Las Vegas attorney Robert Sullivan, who represented Friedrich in the dispute, said the arbitrator got it right by requiring the board to seek a vote of the association residents.

The decision says that just because homeowners might vote against an assessment is no reason not to go through with the voting process, he said. It makes it even more important for the board to communicate to residents why the assessment is needed, Sullivan said.

While homeowners might vote against an assessment, the same could be said of an association board, he said.

The decision leaves unanswered whether a board could vote to impose a special assessment in the event of a no vote by homeowners, Sullivan said.

"But the answer is not to disenfranchise the voters," he said.

The decision does have some applicability to other associations that require homeowner votes in their rules, Sullivan said. It would be persuasive, but not binding, for other associations, he said.

The Rancho Bel Air decision can be appealed to district court, but there is no indication yet if the association will do so, Sullivan said.

Friedrich said he has struck a blow for homeowners all across Nevada with the decision.

But whether Friedrich, a transplanted New Yorker who now lives in Rancho Bel Air, is viewed as a hero or a troublemaker depends on who you talk to.

"The board despises me and the feeling is mutual," he said.

The $20 a month fee was suspended for 90 days as a result of the decision. By then, the association must put the issue to a vote.

Putting the issue to a vote as required by the association rules does not "automatically mean the reserve funding method suggested by the executive board will fail," Newell said in the decision.

Friedrich said he offered to withdraw the arbitration if the board would put the matter to a vote but was ignored.

"I bent over backwards because I wanted the majority to speak," he said. "I thought we lived in a democracy."

Friedrich said the decision should apply to all types of special assessments, and to all homeowners associations that require votes for such assessments in their own rules, as most do.

Robyne Brooks, property manager for the association, said she had not read the decision and could not comment. The attorney representing the association could not be reached for comment Thursday.

Friedrich's efforts to get the matter to a vote almost failed because of what he said were last minute dealings over a homeowners association bill at the Legislature.

Senate Bill 396, as amended in a conference committee in the last minutes of the Legislature, would have taken away voting rights for homeowners association residents, he said.

The proposal was originally in a Senate bill that did not see passage in the Assembly. But it was amended into SB396 at the last minute, Friedrich said.

As a result, Friedrich, among many others, asked Gibbons to veto the measure, which he did, citing in part, "unintended and unanticipated impacts on common-interest communities and those who live within those communities, including the possibility of increased assessments."

**Find this article at:**
http://www.lvrj.com/news/8483492.html

☐ Check the box to include the list of links referenced in the article.

Copyright © Las Vegas Review-Journal, 1997 - 2007